**AINS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–133C.**

United States Court of Federal Claims.

May 23, 2002.

Craig A. Holman, Holland & Knight LLP, Washington DC, argued for the plaintiff.

Patricia M McCarthy, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, argued for the defendant.

## OPINION AND ORDER

BLOCK, Judge.

It has often been said that one of the hardest things in the world is to sue the federal government. This is no mere truism. Government is protected from suit by the doctrine of sovereign immunity.

This doctrine, ingrained in our law, is derived from its English antecedent which presumed that "the king can do no wrong." 1 William Blackstone, Commentaries 238 (Univ. of Chicago Press Ed.1979) ("Besides the attribute of sovereignty, the law also ascribes to the king, in his political capacity, absolute *perfection*. The king can do no wrong.")(emphasis original). Blackstone argued that the doctrine preserves the constitutional independence of the crown and safeguards the balance of power in the unwritten English Constitution between crown, nobility and commons. *Id.; See generally* 5 Kenneth Culp Davis, Administrative Law Treatise 6–7 (2d ed.1984) (quoting Blackstone). Since the days of Edward the First, the English Crown has not been subject to suit unless it specifically consented to such. *See United States v. Lee,* 106 U.S. 196, 205, 1 S.Ct. 240, 27 L.Ed. 171 (1882). And throughout our history, American courts have applied this doctrine to suits against both the United States and the several states. *Id.* at 207, 1 S.Ct. 240 ("And while the exemption of the United States and of the several states from being subjected as defendants to ordinary actions in the courts has since that time been repeatedly asserted here, the principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine").

This case involves a strange progeny born of the doctrine of sovereign immunity—the so-called nonappropriated fund instrumentality or "NAFI." More specifically, the issue *sub judice* is whether the United States Mint is a NAFI. Generally, a NAFI is an entity which does not receive its funds from congressional appropriations. *See United States v. Hopkins,* 427 U.S. 123, 125 n. 2, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). Because this Court can only award judgments from appropriated funds, NAFIs cannot be sued in the United States Court of Federal Claims for their unlawful actions. *Id.* at 124, 96 S.Ct. 2508 (quoting *Standard Oil Company v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942)). Accordingly, the Mint, if found to be a NAFI, could not be sued in this court. This is the primary contention of the defendant United States in the present breach of contract action arising out of a contract between plaintiff AINS Inc., a private computer services company, and the United States Mint to provide the Mint with internet, networking, and computer applications services. The defendant moves to dismiss the complaint under Court of Federal Claims Rule 12(b)(1) for lack of subject matter jurisdiction under the NAFI doctrine, and this court heard oral argument on the motion on March 3, 2003. For the reasons stated below defendant's motion is granted.

## I. Facts

The facts, unless otherwise noted, are undisputed and are drawn from the complaint, defendant's motion to dismiss, plaintiff's motion in opposition, and the appendices attached thereto.

On or about April 10, 1997, the Mint awarded AINS a contract under which AINS would provide computer services to the Mint, including operating, maintaining, documenting, enhancing, and supporting the Mint's local area network, wide area network, and mainframe computer applications. Within this contract are five clauses, numbered below, which AINS alleges the Mint breached.

1. A non-competition clause which prevented the Mint from initiating employment

discussions with any AINS employees working under the contract.

2. A fixed-price hourly rate clause which stipulated that AINS employees work an 8 hour day, and not incur overtime without the Mint's approval. The clause also stipulated that AINS employees were obligated to keep time sheets for their hours worked.

3. A clause establishing a rating system whereby the MINT would rate AINS' performance under the contract and give AINS pay bonuses depending on that rating. The four possible ratings and bonus amounts were as follows: "superior" (in which case AINS received a 5–10% bonus to the contract price); "excellent" (1–5% bonus); "met" (no bonus); or "fair/poor" (10% deduction from the amount due AINS under the contract).

4. A clause stating that AINS "shall provide all required recruiting, training, insurance, and other items directly related to the employment of temporary personnel."

5. A "disputes clause" which required AINS to file disputes under the contract with the MINT's Contracting Officer ("CO"). AINS could appeal decisions of the CO to the Associate Director for Policy and Management/CFO ("Associate Director"). The Associate Director's decision would be considered final.

AINS complains that the Mint breached the first four clauses above.[1] Specifically, AINS alleges that the Mint breached the first clause by improperly luring away three AINS employees and giving them similar jobs at the Mint. The second clause was breached, AINS alleges, when the government improperly deducted 1/2 hr. per day for lunch from each AINS employee's time sheet. AINS alleges this was improper because its employees were only recording time actually worked, and therefore had never included their lunch time on the time sheets.

The alleged breach of the third clause has a somewhat longer explanation. Under the contract, AINS service was to be evaluated every three months. At the end of each

evaluation period, the Mint was to prepare an evaluation letter which AINS could either accept or comment on within ten days of receiving it (termed an "interim award decision letter"). If AINS returned the letter to the Mint with comments, the Mint was to review the comments and then produce a "final award determination letter" which was to be signed by the Award Determination Official. By contract, AINS had ten days to appeal this final award determination letter.

AINS alleges that the Mint disregarded the evaluation system by sending AINS "contractor evaluation forms" for the months of September and October 1999 which gave AINS a rating of "met" and resulted in neither a bonus nor a deduction for AINS. AINS apparently did not protest either the failure by the Mint to adhere to the three month evaluation period or the rating of "met" during the months of September and October of 1999. Thereafter, from November 1999 through June 2000, the Mint allegedly deducted 10% from AINS' compensation for alleged performance deficiencies without following the evaluation procedure, although it is unclear exactly what the Mint did which ran afoul of the process. On June 1, 2000, the Mint apparently sent AINS contractor evaluation forms for the months between November 1999 and March 2000. Each of these forms gave AINS a score of "fair/poor" and referenced a deduction of 10% from the compensation due AINS during those pay periods. Accompanying these forms was one interim award decision letter and one final award decision letter, neither of which were signed by the Award Determination Official.

The last basis for AINS' breach of contract claim arises out of the fourth clause cited above. AINS apparently sought to reassign certain employees from one task to another, however, the Mint refused to allow such reassignments, and routinely interfered with AINS' ability to manage its employees. AINS contends that the Mint's interference with the reassignment of its employees violated the clause stating "AINS shall provide

---

1. The fifth clause of the contract relating to disputes is not a basis for AINS complaint. It is pertinent because, as discussed more fully below, the government alleges that AINS did not exhaust the administrative remedies provided under the contract before bringing their claim to this Court.

all required recruiting, training, insurance, and other items directly related to the employment of temporary personnel."

Based on these allegations, AINS submitted a request for equitable relief on June 19, 2000 to the Mint's CO seeking nearly $608,000 in increased contract performance costs and damages.[2] AINS contends the Mint orally agreed to settle the claim for $192,000, but then issued a response letter to AINS' written claim which made no reference to the oral settlement, and declared AINS entitled to only $104,911.90. AINS then appealed this decision under the contract's disputes clause to the Mint's Chief Financial Officer on March 9, 2001. This appeal cites only the dispute over the time sheet deductions for the employee's lunch hour, and makes no mention of the other grounds listed above. The Mint had neither granted nor denied this appeal as of April 17, 2002, the date AINS filed in this court.

In the complaint *sub judice*, AINS requests that this Court equitably adjust its contract with the Mint, and either award damages of $1,782,056.90 or order the Mint to provide "a meaningful dispute resolution process" and "negotiate the amount of such equitable adjustment in good faith...."

Defendant seeks to dismiss AINS' complaint under Court of Federal Claims Rule 12(b)(1) for lack of subject matter jurisdiction. More specifically, citing such authority as *Furash & Co. v. United States*, 252 F.3d 1336 (Fed.Cir.2001) and *L'Enfant Plaza Props., Inc. v. United States*, 229 Ct.Cl. 278, 668 F.2d 1211 (1982), defendant contends that this court lacks subject matter jurisdiction because the Mint is a NAFI, and therefore, the United States has not waived its sovereign immunity. Defendant contends that the Mint attained NAFI status in 1995 when Congress enacted 31 U.S.C. § 5136 (section 5136 or "Public Enterprise Fund"). Section 5136 created the Public Enterprise Fund, through which the defendant alleges

the Mint funds all its activities with revenues derived solely from seigniorage (the difference between the cost of producing a coin and its face value), and, therefore, does not draw on appropriated funds. Defendant further contends that section 5136 demonstrates a firm indication by Congress that it intended to absolve the United States from liability from the agency's actions.

In the alternative, defendant argues that all but one of the pending claims [3] should be dismissed because plaintiff has not exhausted its administrative remedies pursuant to the disputes clause of the contract. Defendant also argues that, because this court lacks equitable jurisdiction, it has no power to grant plaintiff's prayer for injunctive and declaratory relief.

In response, plaintiff avers that the Mint is not a NAFI, relying in part on the arguments set forth in *MDB Communications, Inc. v. United States*, 53 Fed.Cl. 245 (2002), where the court held that the U.S. Mint did not attain NAFI status. Plaintiff disputes the Mint's NAFI status on three grounds: (1) the Mint operates on a "continuous appropriation" and, therefore, is not a NAFI; (2) Congress has not expressed any firm intent to separate the Mint's activities from the General Fund of the Treasury; and (3) Congress has not sought to absolve the United States from liability for acts of the Mint. Plaintiff also vehemently objects that it did not exhaust the administrative remedies in the contracts disputes clause. Finally, plaintiff asserts that this court has authority to issue a declaratory judgement or other equitable relief where such relief is ancillary to a monetary claim.

## II. Discussion

### A. Standard of Review

In considering a rule 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction rests with the party seek-

---

2. The Request for Equitable Relief actually asserts several other grounds for compensation, however, those grounds are not asserted before this Court and are not relevant to this Court's disposition of the case.

3. The defendant contends that AINS' appeal to the Chief Financial Officer only addressed one issue: the $88,027.85 in principal and interest relating to the dispute over discrepancies between AINS' time sheets and the personnel entry/exit logs kept by the Mint. *See* Def.'s Mot. to Dismiss at 14.

ing to invoke it. *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002). When a federal court hears such a jurisdictional challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* The court must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995) (holding courts obligated "to draw all reasonable inferences in plaintiff's favor"). The court may consider all relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge. *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed. Cir.1985); *Alexander v. United States,* 52 Fed.Cl. 710, 712 (2002).

## B. What is a NAFI?

It would seem to the uninitiated that to determine whether a federal entity is a nonappropriated fund instrumentality, a NAFI, would be a simple matter. After all, it appears to be almost self-defining: a federal entity whose activities are funded entirely by nonappropriated funds. But exactly what any of these terms mean has been a source of confusion. As a result, the doctrine has developed unevenly reflecting changes in both the functions of NAFIs in the appropriations process, and in the structure and source of funding of federal programs.

Because this case revolves around the development and application of the oftentimes confusing NAFI doctrine, it is worthwhile, for clarity sake, to trace the doctrine's historic pedigree as well as its evolution in case law.

### 1. Origin

NAFIs have their origin in war. From the time of ancient Rome to the Europe of the seventeenth and eighteenth centuries, merchants, called "sutlers," have followed armies around and met ships of the navies in ports to supply provisions and contraband. 4 United States General Accounting Office, Office of the General Counsel, Principles of Federal Appropriations Law, ch. 17, 218 (2d ed.2001). The American Articles of War of 1775 authorized sutlers to sell troops items not provided by the government, such as " 'victuals, liquors, or other necessities of life' " and regulated the sutlers hours, conduct and the quality of their merchandise. *Id.* (quoting P.J. Kovar, *Legal Aspects of the Nonappropriated Fund Activities,* 1 Mil. L.Rev. 95, 96 (1958)).

Congress regulated sutlers throughout the early nineteenth century, and by the Act of March 19, 1862, sutlers were assessed a fee, which was deposited in a post fund. This fund was administered by officers and its proceeds were used to aid indigent widows and children of deceased soldiers during the Civil War. *Id.* at 220 (citing 12 Stat. 371). This post fund was the first historically recorded NAFI.[4]

Because the sutler system was subject to abuses, such as fraud and corruption, Congress abolished the system and established trading posts and canteens on certain military posts subject to Army inspectors. *Id.* at 220–21. These canteens and trading posts sold goods for recreation and comfort to soldiers at affordable prices and were later expanded to post exchanges, which operated recreation rooms, restaurants, and goods not supplied by the government. *Id.* at 221–22 (citing 61 JAG Record Book, 1882–1895, 479 (1893)). Although the Army regulated and operated these post exchanges, they were not considered instrumentalities of the United States because they were not funded by appropriated monies, but instead, were trading stores permitted to be kept at a military post for the convenience of the soldiers. *Id.* at

---

**4.** About the same time, a similar nonappropriated fund was created when fines were established by the Articles of War to be collected from officers and soldiers for rowdy behavior. The proceeds from the fund were used to help sick and wounded soldiers. 4 United States General Accounting Office, Office of the General Counsel, Principles of Federal Appropriations Law, ch. 17, 219 (2d ed.2001).

222. The posts were administered by an "officer in charge" who reported to the base commander, and officers, not the government, were responsible for payments for the stocks of the posts. *Id.* During and after World War II, the post exchanges were reorganized into a central organization, now known as the Army and Air Force Exchange Service. *Id.* at 223.

These exchanges were intended to improve morale and to provide for the welfare and recreational needs of the armed servicemen and women.[5] *Id.* at 222–23. Such activities as child care centers, golf courses, restaurants, and gyms have been provided by NAFIs. Although they were run as profit-making ventures, the Government has subsidized these NAFIs with appropriated funds when necessary to meet shortfalls. *Id.* After World War II, these types of NAFIS were extended to the civilian side of the federal government.[6] *Id.* at 223.

The General Accounting Office has identified four characteristics for determining whether a government activity is a nonappropriated fund activity:

1. The activity is established under the authority or sanction of a Government agency with or without an initial advance of Government funds.

2. The activity is created and run by Government officers or employees and/or their dependents.

3. The activity is operated for the benefit of Government officers or employees and/or their dependents.

4. The operations of the activity are financed by the proceeds therefrom rather than by appropriations.

*Id.* at 224–25 (citing B–166710–O.M. (May 6, 1976)); *see also, Bowen v. Culotta,* 294 F.Supp. 183, 185 (E.D.Va.1968).

Perhaps viewing the business model as a more efficient way to organize an activity, or perhaps to avoid the increase of taxes, or both, the operations and activities of much larger federal government agencies, such as the Board of Governors of the Federal Reserve System have been largely funded by

nonappropriated funds. The problem is that such behemoths do not fit the traditional NAFI mold; and, as Hamlet said, "[a]y, there's the rub." William Shakespeare, The Tragedy of Hamlet act 3, sc. 1.

### 2. Development of the Legal Standard

The genesis of the NAFI doctrine is found in the Supreme Court's decision in *Standard Oil Co. of California v. Johnson,* 316 U.S. 481, 484–85, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). During the second World War, California imposed a license tax on the distribution of motor vehicle fuel, but exempted the United States or any federal department from such taxation. *See* 1923 Cal. Stat. 572–574; 1927 Cal. Stat. 1309; 1933 Cal. Stat. 1636–1637; 1935 Cal. Stat. 1696; 1937 Cal. Stat. 2219; 1937 Cal. Gen. Laws, Act 2964. The issue before the Court in *Standard Oil* was whether the military post exchanges qualified for the exemption. In holding that these post exchanges were federal instrumentalities, and thus exempt from the tax, the Court reasoned that "post exchanges as now operated are arms of the Government deemed by it essential for the performance of governmental functions. They are integral parts of the War department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the Constitution and federal statutes." *Standard Oil,* 316 U.S. at 485, 62 S.Ct. 1168. The Court further noted that the "object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. Soldiers, their families, and civilians employed on military posts here and abroad can buy at exchanges ... government assumes none of the financial obligations of the exchange." *Id.*

Years later, the Supreme Court remarked that this earlier observation "was the basis of a series of decisions by the Court of Claims to the effect that it lacked jurisdiction over claims concerning the activities of nonappropriated fund instrumentalities." *Hopkins,* 427 U.S. at 125, 96 S.Ct. 2508. The

---

5. Termed Morale, Welfare, and Recreational (MWR) NAFIs by the Department of Defense.

6. For a list of federal NAFIs, see *Id.* at 217–269.

Court explained that the lack of jurisdiction was predicated upon the rationale that because the government assumed no liability for the federal entity, and therefore, could not be said to have consented to suit, no claim against the United States existed under the Tucker Act, the jurisdictional predicate for this court's predecessor, the Court of Claims. *Id.* (citing *Borden v. United States,* 126 Ct.Cl. 902, 116 F.Supp. 873 (1953); *Pulaski Cab Co. v. United States,* 141 Ct.Cl. 160, 157 F.Supp. 955 (1958); *Kyer v. United States,* 177 Ct.Cl. 747, 369 F.2d 714 (1966), *cert. denied,* 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967)). A "nonappropriated fund instrumentality" was simply defined by the Court as a federal entity "which does not receive its monies by congressional appropriation." *Hopkins,* 427 U.S. at 125 n. 2, 96 S.Ct. 2508 (internal quotations omitted).[7] Recognizing that this denial of jurisdiction could very well leave claimants with no forum in which to seek a remedy, the Court quoted the Court of Claims that despite this hardship " 'it is up to Congress to remedy this apparent harsh result ... [T]he court should refrain from legislating by judicial fiat.' " *Id.* at 125, 96 S.Ct. 2508 (quoting *Keetz v. United States* 168 Ct.Cl. 205, 207, 1964 WL 8586 (1964)).

This unfairness spurred Congress to some partial action when, in 1970, the Tucker Act was specifically amended to include express or implied contracts with military exchanges and the exchange councils of the National Aeronautics and Space Administration ("NASA").[8] But this still left unresolved exactly how to apply the Supreme Court's *Hopkins* definition of a NAFI as a federal entity receiving no appropriated funds.

In 1982, the Court of Claims, in *L'Enfant Plaza,* 229 Ct.Cl. 278, 668 F.2d 1211, fine-tuned the *Hopkins* definition when it faced the issue of whether the Office of the Comptroller of the Currency was a NAFI. In this case, the Comptroller was alleged to have breached a rental agreement for office space. The court noted that its Tucker Act jurisdiction was "limited by the fact that judgments awarded by this court are to be paid out of appropriated monies." *Id.* at 1212 (citing 28 U.S.C. § 2517).[9] However, arguably moving beyond the *Hopkins* test, the court opined that the mere fact that the Comptroller was financially self-sufficient is not enough to make it a NAFI. "There must be a clear expression by Congress that the agency was to be separated from general federal reve-

7. Stated differently, nonappropriated fund instrumentalities are federal entities whose "monies do not come from congressional appropriation but rather primarily from [the entities'] own activities, services, and product sales." *Cosme Nieves v. Deshler,* 786 F.2d 445, 446 (1st Cir. 1986).

8. Rather than abolish the NAFI doctrine altogether, Congress instead chose to create a limited exception from the doctrine for certain federal entities such as the military post exchanges and the exchange councils of the National Aeronautics and Space Administration. *See McDonald's Corp. v. United States,* 926 F.2d 1126, 1129–1133 (Fed.Cir.1991). Consequently, Congress amended the Tucker Act and the "judgment fund" statute, 31 U.S.C. § 1304, to give the Court of Federal Claims jurisdiction over actions against only these specified nonappropriated fund instrumentalities. Pub.L. No. 91–350, 84 Stat. 449 (1970). The legislative history of the 1970 Act makes clear that Congress intended to leave the doctrine complete for all other NAFIs unrelated to the post exchanges and exchange councils. *See McDonald's Corp.,* 926 F.2d at 1132–1133; *see also El-Sheikh v. United States,* 177 F.3d 1321, 1325 (Fed.Cir.1999) (noting that the 1970 amendment to the Tucker Act provided only for a limited waiver of sovereign immunity for con-

tract claims against only those specified nonappropriated fund instrumentalities). The Supreme Court explained that the "purpose of this amendment, as the reports of both Houses made clear, was to afford contractors a federal forum in which to sue nonappropriated fund instrumentalities by doing away with the inequitable 'loophole' in the Tucker Act." *Hopkins,* 427 U.S. at 126, 96 S.Ct. 2508 (citing S.Rep. No. 91–268 at 2 (1969); H.R.Rep. No. 91–933 at 2 (1970), U.S.Code Cong. & Admin.News 1970, p. 3477).

9. "Except as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the General Accounting Office of a certification of the judgment by the clerk and chief judge of the court." 28 U.S.C. § 2517(a) (1994). It is interesting to note that the Federal Circuit has extended the nonappropriated fund instrumentalities doctrine to the Contracts Disputes Act. *See Furash & Company v. United States,* 252 F.3d 1336, 1342 (Fed.Cir.2001) (interpreting *United States v. General Electric Corp.,* 727 F.2d 1567, 1570 (Fed.Cir.1984)).

nues." *Id.* (citing *Breitbeck v. United States* 205 Ct.Cl. 208, 500 F.2d 556, 559 (1974)). Congress must "have intended that the activity resulting in the claim was not to receive or be funded from appropriated funds." *Id.* (citing *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889, 907–908 (1976)).

To the court, a strong indicia of this congressional intent was that the authorizing statute prohibited the agency from receiving appropriated funds. In other words, stating this in the converse, "[t]o sustain jurisdiction here, the requirement is not that appropriated funds have been used for the activity but that under the agency's authorizing legislation Congress could appropriate funds if necessary." *Id.* (citing *Convery v. United States*, 220 Ct.Cl. 106, 597 F.2d 727, 730 (1979); *DeMauro Constr. Corp. v. United States*, 215 Ct.Cl. 364, 568 F.2d 1322, 1328 (1978)); *see also McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996, 1002 (1982). After applying this test, the court found that the Office of the Comptroller was not a NAFI because the "legislation governing this case does not preclude Congressional appropriation of funds to the Comptroller." *L'Enfant Plaza*, 668 F.2d at 1212.

Four years later, the interpretation of both the Dual Compensation Act and the NAFI status of the Board of Governors of the Federal Reserve System ("Federal Reserve Board") was the underlying issue facing the Federal Circuit in *Denkler v. United States*,

782 F.2d 1003 (Fed.Cir.1986). Appellants were four retired military officers who had taken staff positions with the Board of Governors of the Federal Reserve Board. The appellee United States and the General Accounting Office ("GAO") had determined that the Dual Compensation Act, 5 U.S.C. § 5531, required that the annuities owed these retired officers be reduced (to the degree required by a statutory formula) due to their civilian employment. *Id.* at 1004.[10] Whether or not the Dual Compensation Act applied, revolved around the question of whether the Act's explicit inclusion of employment with a NAFI included all NAFIs or just NAFIs administered by the Department of Defense, such as our old friend the military exchanges.[11] *Id.* at 1005. Despite the literal language of the provision limiting included NAFIs to only those under the jurisdiction of the armed forces, both the United States and the GAO interpreted the provision to encompass all NAFIs because the language of the provision was "illustrative rather than selective." *Id.* at 1007.

In holding for the United States, the lower court apparently construed the Dual Compensation Act to embrace not just military, but all NAFIs because not to do so would work an "absurd result." [12] *Id.* In rejecting this position as archaic, and in over turning the trial judge,[13] the appellate court forewarned that, "anything more is setting up

---

10. The Dual Compensation Act was promulgated to prevent "double dipping" *Id.*

11. As the court explained:
   Whether or not the limitations on 'dual compensation' of retired regular officers in 5 U.S.C. § 5532 limits their right to annuities if employed by the board here involved, depends on the definition of 'position' in section 5531(2). So far as pertinent, it reads as passed in 1964: '(2) 'position' means a civilian office or position ... in the legislative, executive, or judicial branch of the Government of the United States (including a Government corporation and a *nonappropriated fund instrumentality under the jurisdiction of the armed forces*) or in the government of the District of Columbia.' *Id.* (citing Dual Compensation Act of 1964, Pub.L. No. 88–448, 78 Stat. 484, 556 (1964) (emphasis added)).

12. As noted by the Federal Circuit, the trial judge, in an unpublished opinion, quoted a seminal Court of Claims decision, *Otoe & Missouria*

*Tribe of Indians v. United States*, 131 Ct.Cl. 593, 131 F.Supp. 265 (1955), *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955), for the proposition that "[t]he application of any particular rule [of statutory construction] may well be affected by other rules in order to avoid absurd results."

13. The Federal Circuit opined that, to the contrary, "we have ... in more recent litigation, had to conclude that the absurd result, as it appears to the judge, of literal construction of a statute, does not justify a reading unsupported by the text, unless it can be shown that the intent of Congress was imperfectly expressed, a showing that can be made from legislative history or from the structure of the statutes taken as a whole." *Id.* (citing *Ambassador Division of Florsheim Shoe v. United States*, 748 F.2d 1560, 1564 (Fed. Cir.1984)).

the judge as wiser than the legislator." *Id.* at 1007–1008.

Significant for our purposes, the *Denkler* court discussed the criteria necessary for considering a federal entity a NAFI. The court first scrutinized the enabling statutes authorizing the Federal Reserve Board and noted three key elements: (1) the Federal Reserve Board was self-financing in that, by statute, it "levies upon the Federal Reserve banks assessments sufficient to pay, among other things, salaries of members and employees, so that no appropriation need be or is requested for these purposes;" (2) the Federal Reserve Board's enabling statute made clear that these funds "shall not be construed to be Government funds or appropriated moneys;" and (3) a perusal "of the statute reveals no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part." *Id.* at 1004–1005.

Applying the *L'Enfant Plaza* "clear expression" test, the *Denkler* court found the Federal Reserve Board to be a NAFI:

> We think such a 'clear expression' is made in the legislation here, at least with respect to the board's needs for money to pay salaries to its staff. The *combination* of designation of assessments on banks as the source of funds for salaries, and the absence of the conventional language authorizing funds to be appropriated, even when other sources are also looked to, accomplishes such clear expression.

*Id.* (quoting *Norris Industries, Inc. v. United States*, 231 Ct.Cl. 10, 681 F.2d 751, 752 (1982)) (emphasis added).

It is apparent that no one factor in-and-of-itself was determinative. Instead, the court employed a pragmatic approach to ascertain the "clear expression" of Congress that the federal entity was intended to be a nonappropriated fund instrumentality by segregating that entity from use of general federal revenues. *Accord Research Triangle Inst. v. Bd. of Governors of Federal Reserve System*, 132 F.3d 985, 988 (4th Cir.1997) (concluding that the Board of Governors of the Federal Reserve System is a nonappropriated fund instrumentality).

Probably the most important case construing the NAFI doctrine is the recent Federal Circuit decision, *Furash & Company v. United States*, 252 F.3d 1336 (Fed.Cir.2001). The case involved a breach of contract claim against the Federal Housing Finance Board ("Finance Board"), which administers the federal home loan bank system, for terminating plaintiff Furash's consulting services. The Court of Federal Claims dismissed the suit for lack of jurisdiction because it found the Finance Board to be a nonappropriated fund instrumentality.

In affirming the trial court, the Federal Circuit reiterated the importance of the *L'Enfant Plaza* "clear expression" test.[14] Applying the test, the court found that "there has been a clear expression by Congress that the Finance Board's operations are to be funded through assessments against federal home loan banks, not from general fund revenues, and that the Court of Federal Claims therefore lacks Tucker Act jurisdiction over this case." *Id.* at 1339–40. Examining the pertinent provision of the Board's authorizing statute, 12 U.S.C. § 1438(b), the court determined that NAFI status was not negated simply because this provision did not expressly prohibit congressional appropriation

---

14. It is worthwhile to quote the court at length:
    In applying the non-appropriated funds doctrine, this court has held that the Court of Federal Claims must exercise jurisdiction absent a clear expression by Congress that it intended to separate the agency from general federal revenues. To establish jurisdiction, the plaintiff need not show that appropriated funds have actually been used for the agency's activities, but only that 'under the agency's authorizing legislation Congress could appropriate funds if necessary.' Thus, the fact that an agency such as the Finance Board has been financially self-sufficient is not dispositive. Instead, 'Congress must have intended that the activity resulting in the claim was not to receive or be funded from appropriated funds'; that is, there must be a 'firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts' of the agency.
    *Furash*, 252 F.3d at 1339 (quoting *L'Enfant Plaza*, 668 F.2d at 1212).

of funds to the Board.[15] "Under the test set forth in *L'Enfant Plaza*, what matters is whether the agency's authorizing legislation makes clear that Congress intends for the agency—or the particular activity that gave rise to the dispute in question—to be separated from general federal revenues." *Id.* at 1340.

The court observed that in *Denkler*, the Federal Reserve Board's authorizing statute similarly "contained no express statement that the appropriated funds could not be used to support the Board's operations," but, nonetheless, concluded that there existed a clear expression by Congress that the Board was a NAFI "in light of the 'combination of designation of assessments on banks as the source of funds for salaries, and the absence of the conventional language authorizing funds to be appropriated.'" *Id.* (quoting *Denkler*, 782 F.2d at 1005). Further noting that the authorizing legislation for the Finance Board closely paralleled that found in the Federal Reserve Board's authorizing legislation, the court observed that absent a statutory amendment there is no situation in which appropriated funds would be used to fund the Finance Board. *Id.*[16]

Finally, the court considered the Finance Board to be a NAFI even though funds levied on federal home loan banks were deposited in the general treasury fund[17] and the Board's authorizing statute contained a specific exception to the nonappropriated fund statutory scheme.[18] As to the former, the court explained that because these funds are to be kept distinct from general funds, it does not matter that the bank levies are to be deposited in the general treasury. (In other words, only amounts representing the deposited proceeds from the banks could be used for Board expenses. There is, of course, no separate vault in the treasury marked "federal home loan bank deposits"— there is merely a separately designated "special" account.) As to the latter, it was clear to the court that except for these special expenses to be paid from appropriated monies, which were not at issue in the case, "the Finance Board's expenses are not expected to be defrayed by appropriated funds." *Id.* at 1341. In other words, "Congress intended the Finance Board to be a financially self-sufficient instrumentality designed to operate without the benefit of general appropriated funds." *Id.*

■ With *Furash*, the NAFI doctrine has come to full fruition. Examining *Furash* and its progenitors, to be considered a nonappropriated fund instrumentality, a federal entity must meet the following four criteria. First, it must "not receive its monies by congressional appropriation." *Hopkins*, 427 U.S. at 125 n. 2, 96 S.Ct. 2508. Second, and conversely, its funding must derive "primarily from [the entities'] own activities, services, and product sales." *Cosme Nieves v. Deshler*, 786 F.2d 445, 446 (1st Cir.1986). Third, there "must be a clear expression by Congress that the agency was to be separated from general federal revenues." *L'Enfant Plaza*, 668 F.2d at 1212. This "clear expression" required under *L'Enfant Plaza* may be gleaned from several nonexclusive

---

**15.** "To be sure, section 1438 does not expressly prohibit congressional appropriation of funds to the Finance Board. The absence of such an express statement in the authorizing statute, however, does not end the inquiry." *Id.*

**16.** This is unlike the situation faced by the court in *L'Enfant Plaza* where the authorizing legislation contemplated that the Comptroller of the Currency receive appropriated funds when the funds received from regulated banks by the Comptroller were insufficient to cover expenses. *Id.* at 1341.

**17.** 12 U.S.C. § 1422b(c) provides that:
Receipts of the Board derived from assessments levied upon the Federal Home Loan Banks and from other sources ... shall be deposited in the Treasury of the United States.

Salaries of the directors and other employees of the Board and all other expenses thereof may be paid from such assessments or other sources and shall not be construed to be Government Funds or appropriated monies, or subject to apportionment for the purposes of chapter 15 of Title 31, or any other authority.

**18.** 12 U.S.C. § 1438(a) provides that studies or investigations directed by law or requested by Congress "shall be considered an administrative expense." The court agreed with the trial court that this means that those costs are to be paid from appropriated funds and that this specific exception "does not alter the [general] status of the Finance Board as a nonappropriated fund instrumentality." *Id.*

factors including: (a) the authorizing statute expressly prohibits the federal entity from receiving appropriated funds (*L'Enfant Plaza*, 668 F.2d at 1212); (b) the authorizing statute creating the federal entity (i.e., the enabling act) "reveals no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part" (*Denkler*, 782 F.2d at 1004–1005); and (c) the authorizing statute expressly specifies that the funds used to finance the federal entity "shall not be construed to be Government funds or appropriated moneys" (*Denkler*, 782 F.2d at 1005).

■ Fourth, and conceivably the most important attribute of a NAFI, the *primus inter pares* of the criteria (yet may possibly be considered a restatement of the prior factors), is that absent a statutory amendment, there is no situation in which appropriated funds could be used to fund the federal entity. *Furash*, 252 F.3d at 1340. In other words, "[t]he nonappropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the agency, but could not be." *United States v. General Electric Corp.*, 727 F.2d 1567, 1570 (Fed.Cir.1984).

■ Finally, it is not fatal to NAFI status that either: (a) the nonappropriated funds either generated by the federal entity or received by the federal entity are to be by statute deposited in the general treasury fund, as long as these nonappropriated funds are to be used solely by the federal entity to pay its expenses; or (b) that the federal entity's authorizing statute contains a narrow, specified exception to the nonappropriated fund statutory scheme whereby the federal entity receive appropriated funds to be used for the aforementioned narrow, specified purpose. *Furash*, 252 F.3d at 1341.

### 3. *Post–Furash Case law*

#### a. *Aaron v. U.S.*

There have been three significant cases decided in this Court since *Furash*. In *Aaron v. United States*, 51 Fed.Cl. 690 (2002),

current and former employees of the Federal Prison Industries, Inc. ("UNICOR") brought suit for overtime pay. The issue facing the court was whether UNICOR was a nonappropriated fund instrumentality, which would require the court to dismiss the suit for lack of jurisdiction. Plaintiffs, in part,[19] argued that UNICOR·was not a NAFI because, even though the corporation was self-financing and had never received appropriated funds, it did borrow money from the U.S. Treasury for use in the construction of a plant and to purchase equipment. *Aaron*, 51 Fed.Cl. at 692. The plaintiffs also argued that NAFI status was not attained because the corporation's enabling statute, unlike those of other NAFIs, did not expressly prohibit the use of appropriated funds for its operations, and that UNICOR's proceeds were deposited within the Treasury. *Id.*

The court, applying *Furash*, rejected these arguments. After noting that "an appropriation is very different than a loan ... which must be repaid," the court found that it was not dispositive that the corporation's enabling statute did not expressly prohibit the use of appropriated funds for its operations or that its proceeds were deposited in the Treasury:

> The most recent expression by the Federal Circuit on the subject, however, *Furash*, 252 F.3d at 1340, rejects this fact as dispositive. That decision also rejects the contention that segregated accounts within the Treasury constitute 'appropriated funds.' *Id.* Thus, while it is true that UNICOR's proceeds are deposited into the Treasury, this fact does not change the character of those funds. They belong to the corporation and are distinct from general revenues.

*Aaron*, 51 Fed.Cl. at 692.

What was of paramount importance to the court was that the statutory scheme creating UNICOR, and the accompanying legislative history, indicated that the corporation be "totally self supporting" without the necessity for appropriations by Congress. *Id.* at 692–694. Furthermore, NAFI status, the court determined, was not defeated because appropriations were initially made to establish the

---

**19.** Only those issues relevant or similar to those raised in the case *sub judice* are examined here.

corporation before it was required to become self-sufficient. Likewise, NAFI status was also unaffected by the fact that various appropriation acts limited UNICOR's administrative expenses because these provisions mention "nothing about appropriating taxpayer dollars for those expenses." *Id.* at 693–694. In sum, the court concluded, "we think the evidence is clear that UNICOR is a NAFI and that Congress has clearly indicated an intent to keep its financial obligations separate from those of the Treasury generally." *Id* at 694.[20]

### b. *Slattery v. U.S.*

Later that year, the court faced the issue of whether the Federal Deposit Insurance Corporation ("FDIC") was a nonappropriated fund instrumentality. In a lengthy decision involving many other issues, the court, in *Slattery v. United States,* 53 Fed.Cl. 258 (2002), held that it was not. Noting that this court does not apply the *L'Enfant Plaza* "clear expression" test blindly, the " 'controlling principle is whether the agency's enabling legislation indicates that Congress intended the activity in question to operate without the benefit of appropriated funds.' " *Id.* at 271–272 (quoting *Furash,* 46 Fed.Cl. 518, 521 (2000)). Stated another way, the issue to the court was " 'not that appropriated funds have been used for the activity but that under the agency's authorizing legislation Congress could appropriate funds if necessary.' " *Id.* (quoting *L'Enfant Plaza,* 668 F.2d at 1212). Thus, to the court, the key question boils down to "what constitutes an appropriation of funds by Congress or a willingness to appropriate such funds." *Id.*

What was at issue in *Slattery* was the FDIC's Bank Insurance Fund (BIF). The court noted that the BIF was a public enterprise "revolving fund" and that a revolving fund gives a federal agency the ability to make deposits to and payments from the same account. A revolving fund was defined as " 'a *permanent authorization* for a pro-

gram to be financed, in whole or in part, through the use of its collections to carry out future operations.' " *Id.* (quoting GAO/PAD–77–25 at 47, quoted in 4 United States General Accounting Office, Office of the General Counsel, Principles of Federal Appropriations Law, ch. 15, 83 (2d ed.2001)).

The court observed that the FDIC received appropriated funds when it was created in 1933 and that more recently a House Report contained a statement that the bank insurance fund may not be able to meet many more bank failures. The court also noted that the Federal Deposit Insurance Corporation Act of 1991 was amended to significantly increase the amount the Treasury could loan to the FDIC. To the court, this signified "a clear intent on the part of Congress to appropriate funds as necessary to support the FDIC." *Id.* at 272–273. Furthermore, the court rejected the distinction defendant made between the self-financing BIF and the appropriated funds the FDIC currently received, finding that:

> the United States would stand behind the BIF and appropriate additional funds as necessary. The fact that such aid has not been necessary does not mean that Congress would not appropriate funds if it did. There is a compelling record to support the proposition that Congress has given the full faith and credit of the Treasury to the FDIC and fully intends to appropriate public money to FDIC if it becomes necessary.

*Id.* at 273.[21]

Of great importance to the court was that there existed a clear history of prompt congressional action to buttress the FDIC by assuring that the Treasury *is able* to support or replenish various FDIC funds if they run out of money. *Id.* (emphasis added). In essence, the court found the BIF to be a "continuing appropriation" and observed that Congress had passed various resolutions indicating that it would appropriate funds to replenish the BIF if need be. *Id.* at 274. In

---

**20.** The reasoning of *Aaron* was recently adopted in *Concepts of Florida, Incorporated v. United States,* 327 F.3d 1331 (Fed.Cir.2003), where the Federal Circuit held that UNICOR was a NAFI.

**21.** Various concurrent resolutions demonstrated congressional intent to place the full faith and credit of the United States behind the FDIC. Off course, a concurrent resolution is not binding as a matter of statutory law.

summary, although no statute authorized appropriated funds for the BIF, the court found that the FDIC was not a NAFI because it believed that prior congressional actions and resolutions clearly indicated that it was foreseeable and certain that future appropriations would be made to the BIF fund if an exigency arose. *But see Wolverine Supply, Inc. v. United States,* 17 Cl.Ct. 190, 195 n. 8 (1989) ("Congress, of course, can appropriate money for any cause at any time. Adoption of plaintiff's reasoning would mean that sovereign immunity would not bar any NAFI claim in this court. . . .").

On the same day that *Slattery* was decided, my colleague, Judge Wiese, decided *MDB Communications, Inc. v. United States,* 53 Fed.Cl. 245 (2002). This case is singularly significant because it addressed the same issue facing this court *sub judice*—whether the United States Mint is a nonappropriated fund instrumentality. It is also the case upon which plaintiffs primarily hang their hat. Because of its significance, we will address it at some length and use this discussion as the vehicle to examine the workings of the Mint and the statutory scheme establishing and funding this federal entity.

### c. *MDB Communications v. U.S.*

*MDB Communications* involved the complaint of an unsuccessful bidder on a contract with the Mint.[22] In 1998 plaintiff, MDB Communications ("MDB"), responded to a solicitation from the Mint for proposals on an advertising, marketing and public relations program to promote the Mint's "Fifty States Commemorative Coin Program" (the "Quarters Program"). *MDB Communications,* 53 Fed.Cl. at 246. MDB submitted their proposal, however, the contract was ultimately awarded to a competing bidder. Several months after the contract was awarded to the competitor, the Mint entered a licensing agreement with Jim Henson Productions, Inc. for the use of Kermit the Frog as a promotional tool for the Quarters Program. MDB contended that its original bid proposal

for promoting the Quarters Program included the use of Kermit the Frog, and that the Mint had unlawfully misappropriated the idea from MDB.

MDB filed a complaint against the Mint in this Court which the defendant sought to dismiss under the NAFI doctrine. Defendant's argument was based primarily on the text of section 5136 which directed that profits from seigniorage be deposited in the "Public Enterprise Fund" which would thereafter finance the Mint's operation. The relevant portions of the statute are as follows:

> There Shall be established in the treasury of the United States, a United States Mint Public Enterprise Fund (the "Fund") for fiscal year 1996 and hereafter: *Provided,* That all receipts from the Mint operations an programs including the production and sale of numismatic items, the production and sale of circulating coinage, the protection of government assets, and gifts and bequests of property, real or personal shall be deposited into the Fund and shall be available without fiscal limitations: *Provided further,* That all expenses incurred by the Secretary of the Treasury for the operations and programs of the United States Mint that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs, and any expense incurred pursuant to any obligation or other commitment of Mint operations and programs that was entered into before the establishment of the Fund, shall be paid out of the Fund: *Provided further,* . . . That the fund may retain receipts from the Federal Reserve System from the sale of circulating coins at face value for deposit into the Fund (retention of receipts is for the circulating operations and programs): . . . *Provided further,* That at such times as the Secretary of the Treasury determines appropriate, but not less than annually, any amount in the Fund that is determined to be in excess of

---

22. The United States Mint has three lines of business: production of coins; manufacturing and marketing of numismatic and bullion coins; and safeguarding the Mints assets. This last line of business includes protecting non-mint assets in the Mint's custody including bullion reserves in Fort Knox and elsewhere. United States Mint, Report to Congress on Operations for the Period of 1/1/02 to 3/31/02, 2nd Quarter Fiscal Year 2002, at 1.

the amount required by the Fund shall be transferred to the Treasury for deposit as miscellaneous receipts . . . .

31 U.S.C. § 5136 (2000).

Defendant argued that the language of the statute clearly demonstrated that Congress intended the Mint to be a self-funding agency, free and clear of any appropriations. As further support for this argument, defendant cited a report by the Senate Committee on Banking, Housing and Urban Affairs accompanying a bill introduced during the 103rd Congress which authorized $30,000 to be charged against the Public Enterprise Fund to pay for the congressional gold medal in honor of Pope John Paul II. The report stated:

> The Treasury Department Appropriation Act for Fiscal Year 1996 consolidated the numismatic and circulating coin operations of the United States Mint into one revolving fund, the United States Mint Public Enterprise Fund. This made the Mint's sole source of funding its revenue-generating programs rather than an annual appropriation.

S.Rep. No. 106–356, at 2 n. 1 (2000).

Judge Wiese began his analysis with two considerations. The first was that "money collected by the Mint from its currency sale to the Federal Reserve constitutes funds received for the use of the United States, i.e., 'funds to be used in bearing the expenses of the administration of the Government and paying the obligations of the United States.'" *MDB Communications,* 53 Fed.Cl. at 248 (quoting 33 Op. Att'y Gen. 316, 321 (1922)). The second consideration was that the Public Enterprise Fund constituted what is termed a "revolving fund," defined as a fund "'to be credited with offsetting collections, primarily from the public, that are generated by and earmarked to finance a continuing cycle of business type operations.'" *Id.* (quoting United States General Accounting Office, A Glossary of Terms Used in the Federal Budget Process (exposure draft), GAO/AFMD–2.1.1, at 5 (1993)).[23]

Judge Wiese went on to opine that, taken together, these two considerations led the Office of the Comptroller General to conclude that a revolving fund (such as the Public Enterprise Fund) was a "continuing or permanent appropriation, i.e., money that is made available for obligation or expenditure without further action by Congress." *Id.* (citing 69 Comp. Gen. 260, 262, 1990 WL 269526 (1990); 62 Comp. Gen. 70, 72, 1982 WL 26709 (1982); 57 Comp. Gen. 311, 313, 1978 WL 13380 (1978); 35 Comp. Gen. 615, 618, 1956 WL 1071 (1956); 35 Comp. Gen. 436, 438, 1956 WL 1119 (1956); 1 Comp. Gen. 704, 706, 1922 WL 981 (1922)). It was noted that this view was endorsed by various courts including the Court of Appeals for the District of Columbia in *United Biscuit Co. of America v. Wirtz,* 359 F.2d 206, 212 (D.C.Cir.1965), *cert. denied,* 384 U.S. 971, 86 S.Ct. 1861, 16 L.Ed.2d 682 (1966). *Id.*

Following the Comptroller General and the *United Biscuit* court, Judge Wiese reasoned that:

> Absent specific statutory authority, all funds received for the use of the United States must be deposited in the general fund of the Treasury as miscellaneous receipts. 31 U.S.C. § 3302 (2000). Congress, however, may authorize the collection or receipt of certain funds by an agency and simultaneously, specify the uses to which such funds may be applied. Such an authorization constitutes an appropriation, i.e., an "authority making amounts available for obligation or expenditure." 31 U.S.C. § 701(2)(c) (2000). Hence, a revolving fund amounts to a continuing appropriation.

*MDB Communications,* 53 Fed.Cl. at 248–249.

In defendant's supplemental brief, the government argued that the Comptroller General's view equating a congressional grant of spending authority (like the Mint's authority to spend monies from the Public Enterprise Fund) to an appropriation was simply too

---

**23.** Judge Wiese also noted that although the text of 31 U.S.C. § 5136 did not use the words "revolving fund," a committee report on a related appropriations bill made reference to the fact that the Mint was financed by a revolving fund. *Id.* at 248; *and see* H.R. Rep. No. 104–183, at 23 (1995).

broad. Under this view, defendant argued, even the spending authority granted to a *recognized* NAFI, such as a military post exchange, would become an "appropriation." *Id.* at 249. Judge Wiese, however, rejected that contention, arguing that the Comptroller General's view was not that every grant of spending authority was an "appropriation," but rather, only those authorizations that grant the expenditure of money belonging to the United States—*i.e.*, funds received "'for the Government.'" *Id.* (citing 31 U.S.C. § 3302(b)).

On similar grounds, Judge Wiese also distinguished *Denkler* and *Aaron*. In *Denkler*, Judge Wiese noted that the authorizing statute for the Board of Governors contained a provision stating "such assessments shall not be construed .to be Government funds or appropriated moneys." *Denkler*, 782 F.2d at 1005. This "express statutory disavowal" of public ownership of the funds collected through the assessments was absent from section 5136 and therefore was inapplicable to MDB's case. Similarly, in *Aaron*, the authorizing statute for UNICOR and the concomitant legislative history expressly segregated revenue received from the sale of prisoner-made products from revenue in the general treasury. Since section 5136 failed to segregate seigniorage revenue from funds in the general treasury, *Aaron* suggested the Mint was not a NAFI. Indeed, Judge Wiese found the Public Enterprise Fund was directly contrary to *Aaron* because section 5136 commingled seigniorage revenue with general governmental funds by specifically requiring that "any amount in the Fund that is determined to be in excess of the amount required by the Fund [to] be transferred to the Treasury for deposit as miscellaneous receipts." *MDB Communications*, 53 Fed. Cl. at 249 (citing 31 U.S.C. § 5136).

In light of *Denkler*, *Aaron* and the Comptroller General's view, Judge Wiese conclud-

ed that the Mint was not a NAFI and therefore denied defendant's motion to dismiss.

**C. What is an Appropriation? The Problem of "Permanent" or "Continuing Appropriations" and "Revolving Funds."**

Whatever the legal standard defining a NAFI, it is itself dependent on a precise understanding of what constitutes an appropriation. Yet it is not always apparent exactly what constitutes appropriated funds—or in the obverse, what nonappropriated funds are. As Representative Wiggins remarked at a House Judiciary subcommittee hearing on nonappropriated fund activities, "I am worried about the definition of 'nonappropriated funds.' Every time I think of one, you give me another." *McDonald's Corp.*, 926 F.2d 1126, 1130 (quoting Nonappropriated Fund Activities: Hearings on S. 980 Before Subcommittee No. 4 of the House Committee on the Judiciary, 91st Cong., 1st. Sess., 18–19 (1969)).

Generally, an appropriation is not money at all, but congressionally delegated statutory "authority making amounts available for obligation or expenditure." 31 U.S.C. § 701(2)(C) (2000).[24] An appropriation must be stated expressly and not implied or inferred in an act. 31 U.S.C. § 1301(d) (providing that a "law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made.").[25] Typical annual and supplemental appropriation acts present no analytical problems because they are generally titled "An Act making appropriations. . . ." 1 United States General Accounting Office, Office of the General Counsel, Principles of Federal Appropriations Law, ch. 2, 13–14 (2d ed.2001). Even if untitled, it may also be clear that an act is an appropriation because

---

**24.** Executive Office of the President, Office of Management and Budget, Budget of the United States, Fiscal Year 2003, Analytical Perspectives 434, defines "appropriations" as budget authority that permits "agencies to incur obligations and make payments." *See also* United States Senate, Committee on the Budget, The Congressional Budget Process, An Explanation, Appendix J Glossary (1998) (defining "appropriations," as

an "act of Congress that permits Federal Agencies to incur obligations and to make payments out of the Treasury for specified purposes.").

**25.** Thus, an appropriation must be expressly stated and cannot be inferred or made by implication. *See, e.g.*, 50 Comp. Gen. 863 (1971).

its wording makes clear that the statute specifies the payment of funds out of the general fund of the Treasury. *Id.* at 14.

But, as a federal budgetary and accounting matter, there is another category of appropriations at times denominated a "permanent or continuing appropriation," at other times, a "revolving fund." As explained by the GAO:

> There is a separate line of decisions establishing the proposition that statutes which authorize the collection of fees and their deposit into a particular fund, and which make the fund available for expenditure for a specified purpose, constitute continuing or permanent appropriations; that is, the money is available for obligation or expenditure without further action by the Congress. The reasoning is that, under 31 U.S.C. § 3302(b) [the Miscellaneous Receipts Act], all money received for the use of the United States must be deposited in the general fund of the Treasury absent statutory authority for some other disposition. Once the money is in the Treasury, it can be withdrawn [pursuant to the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7] only if Congress appropriates it.... Therefore, the authority for an agency to obligate or expend collections without further congressional action amounts to a continuing appropriation of the collections.... This principle has been applied to revolving funds and various special deposit funds.

*Id.* at 15 (citing *United Biscuit Co. of America v. Wirtz,* 359 F.2d 206, 212 (D.C.Cir. 1965), *cert. denied,* 384 U.S. 971, 86 S.Ct. 1861, 16 L.Ed.2d 682 (1966), as an example of a continuing appropriation or revolving fund.)[26] It is important to note that to the GAO it is irrelevant whether the statute specifies a special fund to which receipts or collections are to be deposited, rather than to the general Treasury fund. As long as the same statute grants an authority to make specific expenditures or incur specific obligations, it will be considered an appropriation. *Id.* at 16–17.[27]

It is also interesting to note that the receipts and outlays of most revolving funds or continuing appropriations, such as public enterprise funds, are not treated the same as general receipts (revenue) and general outlays (funds used to finance federal agencies, that is, typical appropriation funding) for budgetary and accounting purposes. *See generally* OMB Analytical Perspectives for Fiscal Year 2003; The Congressional Budget Process (1998); 1 GAO Principles of Federal Appropriations Law, ch. 2, 15–82. For the most part, the receipts and outlays of revolving funds, such as public enterprise funds, are recorded in the same special budget account and not recorded separately as part of the general receipts and outlays of the federal government. Nevertheless, the receipts of revolving funds are deducted from gross outlays to produce net outlay figures which, in turn, are used to calculate overall budget surpluses and deficits. *Id.* In other words, the outlays of most revolving funds are not treated in the same manner as typical appropriation funding for budgetary purposes.

Nevertheless, to apply GAO's "revolving" fund reasoning to Tucker Act jurisprudence is flawed. To consider all "revolving" funds or "continuing or permanent" appropriations as appropriated funds is based on the errone-

---

**26.** The Miscellaneous Receipts Act, 31 U.S.C. § 3302(b), provides that "except as provided in [provision granting contracting authority], an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." Article I, § 9, cl. 7, of the U.S. Constitution (the Appropriations Clause) provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law...." What exactly is the "Treasury" is never defined in the Constitution.

**27.** It is interesting that the Prison Industries Fund, contrary to the holding of the *Aaron* case, was found to be an "appropriated fund." *Id.* at 17 (citing 60 Comp. Gen. 323, 1981 WL 22478 (1981)); *see* 41 C.F.R. § 101–44.001–3 (1979). *But see Core Concepts,* 327 F.3d 1331 (Fed.Cir. 2003). Furthermore, even if the statute is silent as to where the receipts are to be deposited, as long as the receipts are directed to be spent for a specific purpose, the statute will be construed by GAO as authorizing the creation of a specific fund. *Id.* (citing 59 Comp. Gen. 215, 1980 WL 17949 (1980) (42 U.S.C. § 5429); 13 Comp. 219 (1906); B–226520, April 3, 1987 (non-decision letter) (26 U.S.C. § 7475)).

ous view that Congress cannot create special funds and self-financing programs distinct and isolated from the general Treasury funds and, more important to our case, from the general obligations of the United States.

GAO's rationale is the result of two erroneous notions. The first is the equating of the creation of a special fund by Congress with the Miscellaneous Receipts Act's requirement of the deposit of revenue or receipts in the general Treasury fund. The second is the conviction that the Appropriation's Clause is a restriction on congressional legislative power which prohibits any use of a Treasury fund by an agency unless there is a further congressional act appropriating such funds. Consequently, it is apparent that in interpreting a "revolving" fund as a "continuing" appropriation, GAO is creating a legal fiction to avoid what it sees as an unconstitutional result. *See Ashwander v. TVA,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring).

The Miscellaneous Receipts Act cannot in any way be construed to prohibit the deposit of receipts of self-financing program in a special fund or account distinct from that of the general Treasury fund. All the Act literally requires is that miscellaneous money received by government officials be deposited in the general Treasury.

■ Similarly, the Appropriations Clause of the Constitution does not prohibit the use of special funds by an agency pursuant to an authorizing or enabling statute without a separate appropriation act. It has long been held that the Appropriations Clause is not a restriction on Congress, but on the Executive Branch. *See Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321, 57 S.Ct. 764, 81 L.Ed. 1122 (1937).

The underlying rationale is a matter of history. Because tax revenue belongs to the people, the Framers of the Constitution believed that it should be Congress that decides to what purpose these revenues ought to be used. In his *Commentaries on the Constitution of the United States,* Justice Joseph Story explained the purpose of the Appropriations Clause:

> [I]t is highly proper that Congress should possess the power to decide, how and when any money should be applied [for the public good]. If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure. The power to control, and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public speculation. In arbitrary governments the prince levies what money he pleases from his subjects, disposes of it, as he thinks proper, and is beyond responsibility or reproof. It is wise to interpose, in a republic, every restraint, by which the public treasure, the common fund of all, should be applied with unshrinking honesty to such objects, as legitimately belong to the common defense, and general welfare. Congress is made the guardian of this treasure....

J. Story, *Commentaries on the Constitution of the United States,* Book III, Ch. X., § 382 (1832)(Carolina Academic Press Ed.1987). Consequently, all the Clause does is to confine the executive's disbursement of money to only those funds appropriated by Congress. It does not in any way circumscribe Congress from creating self-financing programs such as public enterprise funds to be used for discreet purposes, without first appropriating the funds as it does in typical appropriation and supplemental appropriation acts. To hold otherwise would, in reality, require that the taxpayer be further burdened as a matter of constitutional law by prohibiting such self-financing activities as the Board of Governors of the Federal Reserve System or the Federal Housing Finance Board, agencies construed as NAFIs by the Federal Circuit in *Denkler* and *Furash.*[28]

Furthermore, as a matter of statutory construction, public enterprise programs, self-

---

28. For example, the enabling statute, 12 U.S.C. § 1438, establishing a semiannual assessment on the Federal Home Loan Banks as the funding mechanism for the Federal Housing Finance

Board, is deposited in a special fund in the Treasury, and is drawn on when needed without a separate appropriation act. The constitutional issue was never raised in *Furash.*

financing programs, "revolving" funds, and the like, should not be considered appropriated fund activities. This is because, as noted above, 31 U.S.C. § 1301(d), requires a statute to be construed as an appropriation only if it *specifically* creates "authority making amounts available for obligation or expenditure" from the general treasury. 31 U.S.C. § 701(2)(c) (2000). Authorizing statutes creating revolving funds, such as the various public enterprise funds, do not literally meet the definition of an appropriation.[29] The GAO's designation of these types of funds as "continuing" appropriations fails because, as explained, GAO's interpretation of these statutes as appropriations is the product of inference to avoid what it sees as an unconstitutional result. Ironically, that an appropriation must be expressly stated and cannot be inferred or made by implication is also a matter of GAO's own edicts. *E.g.,* 50 Comp. Gen. 863, 1971 WL 4608 (1971).

That the GAO's view that all "revolving" funds are appropriations for Tucker Act purposes is flawed was made abundantly clear recently in *Core Concepts of Florida, Inc. v. United States,* 327 F.3d 1331 (Fed.Cir.2003). *Core Concepts* involved the same issue in *Aaron,* whether the Federal Prison Industries ("FPI" or "UNICOR") is a nonappropriated fund instrumentality. In rejecting plaintiff's argument predicated upon the GAO's view that FPI was funded by a "revolving" fund and, hence, a "continuing" appropriation, the court held that the authorities cited by the GAO were not applicable to the nonappropriated fund instrumentality doctrine:

First, the Miscellaneous Receipts Act requires that money received by the government be deposited into the general fund of

the Treasury. The Prison Industries Fund, however, is not subject to that requirement in that it retains receipts for FPI, rather than for the government generally, and deposits those receipts into a special account, rather than into the Treasury's general fund. The Miscellaneous Receipts Act thus does not establish that the Prison Industries Fund is an appropriation of general funds. Secondly, the Appropriations Clause provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law..." U.S. Const. art. I, § 9, cl. 7. It imposes a restriction upon the disbursing authority of the Executive Branch, but again does not by itself transform FPI's funds, which reside in an independent account within the Treasury, into general funds of the United States that can be used to pay judgments. Thus, we conclude that Core Concepts' reliance on the GAO's view that all revolving funds are appropriations is misplaced...

*Core Concepts of Florida, Inc.,* 327 F.3d at 1338.

### D. Is the Mint's Public Enterprise Fund a NAFI?

■ The sole remaining task is to determine whether the Mint is a NAFI or, in other words, whether Congress intended the United States to be obligated for the Mint's actions. This can be a difficult task, especially where, as here, a presumption exists that jurisdiction by this court should be entertained unless the agency is clearly separated from general revenues. *See Core Concepts of Florida, Incorporated v. United States,* 327 F.3d 1331, 1334 (Fed.Cir.2003) (quoting *L'Enfant Plaza,* 668 F.2d at 1212).[30]

Mint's Public Enterprise Fund, where only the initial capital outlay for the program came from appropriated funds. Thereafter, as required by the authorizing statute, the Fund became self-financing.

---

**29.** There are exceptions. For instance, the revolving fund described in *United Biscuit Co. of America v. Wirtz,* 359 F.2d 206, 212 (D.C.Cir. 1965), *cert. denied,* 384 U.S. 971, 86 S.Ct. 1861, 16 L.Ed.2d 682 (1966), the military commissary program, is clearly an appropriated fund activity. In this program, the military commissary's purchases of goods was paid for out of a stock fund funded through annual appropriations. Thereafter, whatever money received for goods on resale to military consumers was credited to the stock fund. The following fiscal year, additional monies were appropriated by Congress to the program. This is far different than, for instance, the

**30.** The court, quoting *L'Enfant Plaza,* 668 F.2d at 1212, stated:

To establish jurisdiction, the plaintiff need not show that appropriated funds have actually been used for the agency's activities, but that 'under the agency's authorizing legislation Congress could appropriate funds if necessary.'

Because congressional intent is merely shorthand for a careful examination of statutory language, our inquiry begins with an examination of the Mint's authorizing statute, 31 U.S.C. § 5136. *See generally,* Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv. L.Rev. 417, 419 (1899) ("We do not inquire what the legislature meant; we ask only what the statute means."). The statute, enacted in 1995,[31] established a "public enterprise fund," which, as explained above, is a self-financing mechanism. The pertinent parts of the statute are as follows:

> ... all receipts from Mint operations and programs, including ... the production and sale of circulating coinage, ... shall be deposited into the Fund and shall be available without fiscal year limitations: *Provided further,* That all expenses incurred ... for operations and programs of the United States Mint that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs, ... shall be paid out of the Fund ... [ ]*Provided further,* That the Fund may retain receipts from the Federal Reserve System from the sale of circulating coins at face value for deposit into the Fund ... [ ] *Provided further,* That ... any amount in the Fund that is determined to be in excess of the amount required by the Fund shall be transferred to the Treasury for deposit as miscellaneous receipts ...

31 U.S.C. § 5136 (2000).

The statute thus makes clear that the Mint does not receive appropriated funds. Through the Public Enterprise Fund, the Mint funds all of its activities with revenues derived solely from the Mint's operations.

That Congress intended the Mint to be self-financing is buttressed by legislative history. The House Report accompanying the bill containing section 5136 noted that the Mint would be "financed through the transfer of seigniorage." H.R.Rep. No. 104–183, app. 6, at 23 (1995). Significantly, the purpose of establishing the Public Enterprise Fund was to relieve the Mint of the "funding variables imposed by annual appropriations." *Id.* The House Committee on Appropriations has repeatedly noted that the establishment of the Mint Private Enterprise Fund has "eliminated the need for future appropriations to support the mission of the U.S. Mint." H.R.Rep. No. 104–660, app. 10, at 35 (1996); H.R.Rep. No. 105–240, app. 13, at 36 (1997); *see also* H.R.Rep. No. 106–231, app. 15, at 25 (1999).

Furthermore, even more recently, and as cited by Judge Wiese in *MDB Communications,* the Senate Committee on Banking, Housing, and Urban Affairs explained that the statute creating the Public Enterprise Fund:

> consolidated the numismatic and circulating coin operations of the United States Mint into one resolving fund, the United States Mint Public Enterprise Fund. This made the Mint's *sole source of funding* it[s] revenue-operating programs[,] *rather than an annual appropriation.*

S.Rep. No. 106–356, app. 20, at 2 n. 1 (2000) (emphasis added).

The above cited legislative histories are in reality redundant and unnecessary. *See* Felix Frankfurter, *Some Reflections on the Readings of Statutes,* 47 Colum. L.Rev. 527, 543 (1947) ("Spurious use of legislative history must not swallow the legislation so as to give point to the quip that only when legislative history is doubtful do you go to the statute."). The statute here is clear on its face. In establishing the Public Enterprise Fund, Congress plainly intended the Mint, "to operate without the benefit of appropriated funds." *Furash & Co. v. United States,* 46 Fed.Cl. 518, 521–524, 526 (2000), *aff'd,* 252 F.3d 1336 (Fed.Cir.2001).

But this is not enough to establish a NAFI: "[t]he fact that an agency ... has been financially self-sufficient is not dispositive." *Furash,* 252 F.3d at 1339. "Instead,

---

In other words, Tucker Act jurisdiction exists unless there is a 'firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts' of the agency.

**31.** The Act was enacted as part of Pub.L. No. 104–52, Title V, § 522, 109 Stat. 494 (1995).

'Congress must have intended that the activity resulting in the claim was not to receive or be funded from appropriated funds;' that is, there must be a 'firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts' of the agency." *Id.* (quoting *L'Enfant Plaza,* 668 F.2d at 1212).

Congress has clearly expressed this intent through its authorization of the Mint's Public Enterprise Fund. By directing that all receipts from the Federal Reserve System and the public from the sale of circulating coins at face value must be deposited into a special fund, Congress has made clear that the Mint's funds are to be kept separate and distinct from the general Treasury fund. *See Furash,* 252 F.3d at 1339–1340. And, much like the enabling statutes in *Core Concepts, Aaron, Furash,* and *Denkler,* section 5136 includes "no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part." *Denkler,* 782 F.2d at 1005. Indeed, the express language of the authorizing statute itself makes clear that the Mint's Public Enterprise Fund is not subject to the annual appropriations process: "all receipts from Mint operation and programs, including ... the production and sale of circulating coinage, ... shall be deposited into the Fund and *shall be available without fiscal year limitations.*" 31 U.S.C. § 5136 (2000) (emphasis added).

Thus, the most important attribute of a NAFI is met by the Mint: "absent a statutory amendment there is no situation in which appropriated funds could be used to fund the federal entity." *Furash,* 252 F.3d at 1340. In other words, "appropriated funds not only are not used to fund the agency," here, "but could not be." *General Electric Corp.,* 727 F.2d at 1570. This is most unlike the situation in *Slattery,* where it was foreseeable that Congress could and would appropriate funds to meet the obligations of a fiscally failing agency. In fact, the Mint has never lost money and its statuary scheme contemplates continuing surpluses that will be deposited in the general Treasury as miscellaneous receipts. 31 U.S.C. § 5136 (2000);

*and see* Def.'s Mot. to Dismiss, Decl. of Jay Weinstein, Chief Financial Officer of the United States Mint.

Furthermore, the court finds plaintiff's arguments to be unpersuasive. Plaintiff's primary argument, relying on Judge Wiese's analysis in *MDB Communications* adopting the GAO view that revolving funds, including the Mint's Private Enterprise Fund, constitute a "continuing" appropriation, is rejected. As noted, the recent *Core Concepts* Federal Circuit case has taken the wind out of this sail. Be that as it may, AINS has other ammunition in its arsenal.

AINS also argues that because the surplus of the Public Enterprise Fund is transferred to the Treasury as miscellaneous receipts, that undercuts any argument that there exists "a clear expression by Congress that the agency was to be separated from general federal revenues." *L'Enfant Plaza,* 668 F.2d at 1212. However, the Board of Governors of the Federal Reserve Board, established as a NAFI in *Denkler,* has since 1947 established a policy to transfer excess earnings to the Treasury. *See* 33 Fed. Res. Bull. supp. app. I–2 (May 1947). Congress in 2002 expressly required the Federal Reserve Board to transfer any surplus for fiscal year 2000 to the secretary of the Treasury for "deposit in the general fund of the Treasury." 12 U.S.C. § 289(b)(1) (2000).

Moreover, what really is at issue is whether the agency receives or is able to receive appropriated funds for its operations. For instance, the Federal Circuit in *Furash* rejected the argument that NAFI status will be defeated even where an agency's operating funds are deposited in the Treasury, as long as those funds are kept distinct from general funds. The creation of a distinct special fund or account in the Treasury is an indication that the agency does not receive appropriated funds. Therefore, that excess funds are to be deposited in the Treasury as miscellaneous receipts has no bearing on whether the Mint, or any other agency, is a NAFI. The focus is on whether its operating funds are derived from appropriations.

Plaintiff also argues that the Mint's continuing duty to report to Congress obviates NAFI status. This argument must be re-

jected out-of-hand. It is beyond cavil that Congress, pursuant to its constitutional authority, may define the duties of agencies. *See* U.S. Const. art. I, § 8, cl. 18 (providing in the Necessary and Proper Clause that Congress shall have the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"). To mention just one, since 1949 Congress has directed UNICOR's activities, an agency held to be a NAFI just a few weeks ago by the Federal Circuit in *Core Concepts,* by limiting UNICOR's use of corporate funds. *See, e.g.,* Pub.L. No. 179, Title V (1949); Pub.L. No. 93–433, 88 Stat. 1187 (1974); Pub.L. No. 94–121, 89 Stat. 611 (1975); Pub.L. No. 100–459, 102 Stat. 2186, 2197 (1988); Pub.L. No. 101–515, 104 Stat. 2101, 2115 (1990); Pub.L. No. 103–121, 107 Stat. 1153, 1162 (1993); Pub.L. No. 104–208, 110 Stat. 3009, 3009–12 (1996).

AINS also contends that because the Mint was required to pay back its loan, this indebtedness indicates that Congress did not intend to grant the Mint NAFI status. But this court agrees with Judge Bruggink, who observed in *Aaron* that "an appropriation is very different than a loan ... which must be repaid." *Aaron,* 51 Fed.Cl. at 692.

Nor does the court find plaintiff's contention persuasive that because much of the Mint's funding comes from the Federal Reserve Board that it must be denied NAFI status. AINS maintains that the requirement by law that the Federal Reserve credit the Mint's account for the full face value of the coinage that the Mint supplies to the Federal Reserve Banks amounts to an appropriation by Congress. Nevertheless, besides offering no citation to support this dubious proposition, these stubborn facts remain: the Federal Reserve Board, itself held to be a NAFI in *Denkler,* is funded by assessments made on member banks. Therefore, if the Federal Reserve Board does not directly receive appropriated funds, how does revenue directly obtained from the Board by the Mint, and thus indirectly from private third parties, magically transform into appropriated funds? To adopt plaintiff's argument would in essence contravene the Federal Circuit's recent *Core Concepts* holding that revolving funds are not *ipso facto* appropriations.

Finally, the court rejects plaintiff's argument that because the Mint's enabling statute did not contain the magic words that its receipts "shall not be construed to be government funds or appropriated moneys"—as was the case for the Federal Reserve Board in *Denkler*—this court should deny NAFI status to the Mint. The court notes that Congress, in the enabling statutes examined in *Aaron, Core Concepts, Hopkins,* and other cases finding NAFI status, did not expressly designate these agencies' funds as nonappropriated funds. Ultimately, what defined a nonappropriated fund instrumentality in these cases was whether the authorizing statute allowed the receipt of appropriated funds.

Accordingly, this Court finds that the U.S. Mint is a nonappropriated fund instrumentality for which the United States has not assumed any obligation that is cognizable in this court. In doing so, the court recognizes the hardship this may create because it may, for the most part, deny a forum in which to vindicate valid claims. Certainly the NAFI devise has grown from small post exchanges established to increase the morale of our service men and women to such agencies as the functional equivalent of a central bank, the Board of Governor's of the Federal Reserve System. Yet it is not the duty of a court in our republic to act as a super-legislature, as a Platonic Guardian, to cure the ills of constitutional democracy. *See Denkler,* 782 F.2d at 1007–1008 ("anything more is setting up the judge as wiser than the legislator").

One doubts whether our political leaders, our representatives, and certainly the general public, are aware of the problem that the extension of the NAFI doctrine presents. It is not simply that private parties are denied an efficient juridical remedy to vindicate claims, it is that by extending this doctrine, as a way perhaps to save the taxpayer's pocket book, the unintended consequence may also create a powerful disincentive to contract with these NAFI agencies. For

without a speedy, meaningful remedy for resolution of contractual disputes, we maybe transforming the maxim *caveat emptor,* let the buyer beware, into *caveat pactor,* let the contractor beware. It is indeed conceivable that the extension of the NAFI doctrine will ultimately increase the price of government goods and services by denying the efficiency of the market place to institutions, such as private enterprise funds, ironically established to mimic the market place.

Congress in 1970 selectively amended the Tucker Act to allow suits against certain NAFIs in this court, and in this next century, thirty-three years later, it is perhaps time for Congress to revisit the issue. The Court of Federal Claims' predecessor was established in 1855 to provide a forum for the American people to sue their government. But it became a full-fledged court in the Lincoln Administration, and, in may ways, this is Mr. Lincoln's court. As Abraham Lincoln observed in his message to Congress in 1861: "It is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals."

We have thus come full circle and returned to what this case is really about: sovereign immunity. Until Congress lifts sovereign immunity and allows at least some suits against these large NAFIs, what very well could be a vested right in the common circumstance cannot be vindicated in this court. "The Government of the United States has been emphatically termed a government of laws, not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 163, 2 L.Ed. 60 (1803).

### III. Conclusion

For the foregoing reasons, the defendant's motion to dismiss is granted, with judgment being entered in favor of the United States. Because the motion to dismiss was granted on sovereign immunity jurisdictional grounds, there is no need to address the other issues pending before the court.

**IT IS SO ORDERED.**

No costs allowed.