**MDB COMMUNICATIONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–984C.**

United States Court of Federal Claims.

Aug. 14, 2002.

M. Roy Goldberg, Schnader Harrison Segal & Lewis, LLP, Washington, D.C., attorney of record for plaintiff.

Kyle Chadwick, Patricia M. McCarthy, with whom were Assistant Attorney General Robert D. McCallum, Jr., Director David M. Cohen, Assistant Director Mark A. Melnick, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant, Jacqueline Romero, Department of the Treasury, of counsel.

## OPINION

WIESE, Judge.

### I.

In the spring of 1998, plaintiff, MDB Communications, Inc., responded to a solicitation issued by the United States Mint inviting the submission of proposals for an integrated advertising/marketing/public relations program to be undertaken in support of the Mint's Fifty States Commemorative Coin Program ("the Quarters Program"). Although plaintiff's proposal was among the four submissions chosen for final evaluation, the Mint ultimately awarded the contract to Grey Advertising.

Some months after the award to Grey Advertising, the Mint entered into a licensing arrangement with Jim Henson Productions, Inc. that contemplated, *inter alia*, using Kermit the Frog, the Henson Company's widely recognized artistic creation, to serve as the principal "spokesperson" for the Quarters Program. It is this use of Kermit the Frog that makes up the substance of plaintiff's complaint.

Specifically, plaintiff contends that the Mint's adoption of Kermit the Frog for the Quarters Program represents the unauthorized use of the marketing concepts presented in plaintiff's solicitation proposal: namely, reliance on a widely recognized fictional character possessing cross-generational appeal to serve as the spokesperson for the Quarters Program. Plaintiff contends that this appropriation of its marketing idea is a violation of the restrictions against unlicensed disclosure and use that were included as part of plaintiff's solicitation, and hence, constitutes the breach of an implied-in-fact contract by the Mint.

Shortly before the commencement of trial, defendant filed a motion to dismiss the complaint for lack of jurisdiction. The basis for defendant's motion is the contention that the Mint is a non-appropriated fund instrumentality, *i.e.*, an activity that operates without the use of congressionally appropriated funds. Because judgments of this court are payable only from appropriated funds, any demand for monetary relief against a non-appropriated fund instrumentality has traditionally been recognized to fall outside this court's jurisdiction.

The court heard oral argument on defendant's motion to dismiss on June 10, 2002. At the conclusion of the argument, the court entered a bench ruling denying the motion. The case then proceeded to trial. Following the trial, the court again entered a bench ruling, this time in defendant's favor. In this opinion, we more fully explain the bases for the two bench rulings.

### II.

The jurisdiction of the United States Court of Federal Claims is founded on the Tucker Act, 28 U.S.C. § 1491 (2000), which waives sovereign immunity for claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This jurisdictional grant is limited, however, by 28 U.S.C. § 2517 (2000), which requires that "judgments awarded by the Court of Federal Claims ... be paid out of appropriated funds." *Furash & Co. v. United States,* 252 F.3d 1336, 1339 (Fed.Cir. 2001). Because of this limitation, the court cannot exercise jurisdiction over claims that

do not arise out of activities supported (or supportable) by appropriated funds. *L'Enfant Plaza Props., Inc. v. United States,* 229 Ct.Cl. 278, 668 F.2d 1211 (1982).

█ Defendant bases its assertion that the Mint is non-appropriated fund instrumentality on the text of 31 U.S.C. § 5136 (2000). In this statute, enacted in 1995, Congress endeavored to simplify the financial and accounting operations of the Mint, as well as to ease the burdens of its own legislative oversight responsibilities, by consolidating the Mint's various currency– and coin-related activities [1] within the framework of a single administrative unit: the United States Mint Public Enterprise Fund ("the Public Enterprise Fund" or "the Fund"). The operations of the Public Enterprise Fund were in turn to be funded through the transfer of seigniorage, *i.e.,* the difference between the cost of producing a coin and its face value.

The relevant portions of 31 U.S.C. § 5136 read, as follows:

There shall be established in the Treasury of the United States, a United States Mint Public Enterprise Fund (the "Fund") for fiscal year 1996 and hereafter: *Provided,* That all receipts from Mint operations and programs, including the production and sale of numismatic items, the production and sale of circulating coinage, the protection of Government assets, and gifts and bequests of property, real or personal shall be deposited into the Fund and shall be available without fiscal year limitations: *Provided further,* That all expenses incurred by the Secretary of the Treasury for operations and programs of the United States Mint that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs, and any expense incurred pursuant to any obligation or other commitment of Mint operations and programs that was entered into before the establishment of the Fund, shall be paid out of the Fund: *Provided further,* ... That the Fund may retain receipts from the Federal Reserve System

from the sale of circulating coins at face value for deposit into the Fund (retention of receipts is for circulating operations and programs); ... *Provided further,* That at such times as the Secretary of the Treasury determines appropriate, but not less than annually, any amount in the Fund that is determined to be in excess of the amount required by the Fund shall be transferred to the Treasury for deposit as miscellaneous receipts....

31 U.S.C. § 5136. Of chief importance to defendant's argument are the following excerpts from the above-quoted text:

"all receipts from Mint operations and programs, including ... the production and sale of circulating coinage, ... shall be deposited into the Fund and shall be available without fiscal year limitations";

"all expenses incurred ... for operations and programs of the ... Mint that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs, ... shall be paid out of the Fund";

"the Fund may retain receipts from the Federal Reserve System from the sale of circulating coins at face value for deposit into the Fund"; and

"any amount in the Fund that is determined to be in excess of the amount required by the Fund shall be transferred to the Treasury for deposit as miscellaneous receipts."

In defendant's view, this language plainly demonstrates that the Mint's Public Enterprise Fund is, first, a self-funding operation free from dependence on congressional appropriations and, second, an operation whose revenues are available for expenditure without fiscal-year limitation. Additionally, defendant points out that the statute contains no provision for Congress to appropriate general tax receipts for Mint activities or liabilities. According to defendant, then, these characteristics of the statutory scheme provide a firm indication that Congress in-

---

1. The United States Mint manufactures coins for the nation's commerce as well as numismatic, commemorative, and bullion coins. The Mint is also responsible for safeguarding the nation's deposits of gold and silver bullion.

tended to absolve appropriated funds from any liability for the Mint's operations.

In addition to its statutory argument, defendant draws our attention to a statement that appears in a report by the Senate Committee on Banking, Housing, and Urban Affairs on S. 2453, 106th Cong. (2d Sess.2000), a bill authorizing an appropriation of $30,000, to be charged against the Fund, to cover the costs of a congressional gold medal in honor of Pope John Paul II. In this report, Congress noted:

> [T]he Treasury Department Appropriation Act for Fiscal Year 1996 consolidated the numismatic and circulating coin operations of the United States Mint into one revolving fund, the United States Mint Public Enterprise Fund. This made the Mint's sole source of funding its revenue-generating programs rather than an annual appropriation.

S.Rep. No. 106–356, at 2 n. 1 (2000). Defendant reads this statement as a clear-cut affirmation of its position that the Fund operates without appropriated funds unless, as in the case of S. 2453, Congress specifically earmarks a particular amount in the Fund as an appropriated amount.

Although defendant has argued its position well, we are not convinced of its initial premise. Defendant's argument is based on the assertion that the revenues collected by the Fund (i.e., the seigniorage derived from the Mint's currency sales to the Federal Reserve) are not appropriated funds because they have not been specifically designated as such by Congress. This position, however, is not one we can accept.

Our view of the matter starts with two basic considerations, both of which are uncontested. The first consideration is that the moneys collected by the Mint from its currency sales to the Federal Reserve constitute funds received for the use of the United States, i.e., "funds to be used in bearing the expenses of the administration of the Government and paying the obligations of the United States." 33 Op. Att'y Gen. 316, 321 (1922). The second consideration is that the Fund constitutes what is referred to in the vocabulary of the federal budget process as a "public enterprise revolving fund." A public

enterprise revolving fund is a fund that is established by a specific statutory provision "to be credited with offsetting collections, primarily from the public, that are generated by and earmarked to finance a continuing cycle of business-type operations." United States General Accounting Office, A Glossary of Terms Used in the Federal Budget Process (Exposure Draft), GAO/AFMD–2.1.1, at 5 (1993).

Although the term "revolving fund" does not appear in the text of Section 5136, there is no doubt that such a funding structure is what Congress had in mind: "The Committee [on Appropriations] has included a provision [Section 522 of H.R.2020, a bill making appropriations for the Department of the Treasury, the Postal Service, the Executive Office of the President, and certain independent agencies for the fiscal year ending September 30, 1996] which authorizes the establishment of a revolving fund to finance the operations of the U.S. Mint. The Fund will be financed through the transfer of seigniorage." H.R.Rep. No. 104–183, at 23 (1995).

Taken together, these two considerations have consistently led the Office of the Comptroller General to conclude that a revolving fund is, in substance, a continuing or permanent appropriation, i.e., money that is made available for obligation or expenditure without further action by Congress. See, e.g., 69 Comp.Gen. 260, 262, 1990 WL 269526 (1990); 62 Comp.Gen. 70, 72, 1982 WL 26709 (1982); 57 Comp.Gen. 311, 313, 1978 WL 13380 (1978); 35 Comp.Gen. 615, 618, 1956 WL 1071 (1956); 35 Comp.Gen., 436, 438, 1956 WL 1119 (1956); 1 Comp.Gen. 704, 706, 1922 WL 981 (1922). This view has also been endorsed by the courts. See, e.g., United Biscuit Co. of America v. Wirtz, 359 F.2d 206, 212 (D.C.Cir.1965), cert. denied, 384 U.S. 971, 86 S.Ct. 1861, 16 L.Ed.2d 682 (1966).

The reasoning that supports this result is straight-forward. Absent specific statutory authority, all funds received for the use of the United States must be deposited in the general fund of the Treasury as miscellaneous receipts. 31 U.S.C. § 3302 (2000). Congress, however, may authorize the collection or receipt of certain funds by an agency and,

simultaneously, specify the uses to which such funds may be applied. Such an authorization constitutes an appropriation, *i.e.*, an "authority making amounts available for obligation or expenditure." 31 U.S.C. § 701(2)(c) (2000). Hence, a revolving fund amounts to a continuing appropriation.

We regard this reasoning as sound. Defendant, however, does not. In a supplemental brief filed at this court's invitation, defendant takes the position that in equating a congressional grant of spending authority to an appropriation, the Comptroller General pronounces a rule that is simply too broad. Under that view, defendant insists, even the spending authority granted to a recognized non-appropriated fund instrumentality, such as a military post-exchange, would become an "appropriation."

Defendant's argument, however, misses the mark. The Comptroller General's rulings do not stand for the proposition that every legislative grant of spending authority qualifies as an appropriation. Rather, it is only those authorizations that are directed to the expenditure of money belonging to the United States, *i.e.*, funds received "for the Government," 31 U.S.C § 3302(b), that are the focus of the Comptroller General's rulings.

Defendant also contends that our opinion on this matter stands at odds with other decisions in this circuit, notably, *Denkler v. United States*, 782 F.2d 1003 (Fed.Cir.1986), and *Aaron v. United States*, 51 Fed.Cl. 690 (2002). Again, we disagree. The determination of "non-appropriated fund" status that was at the center of each of these cases turned on explicit expressions of such status by the legislature.

In *Denkler*, for example, the Court of Appeals for the Federal Circuit found the Board of Governors of the Federal Reserve System to be a non-appropriated fund instrumentality, at least with respect to the funding source of its payroll for salaried employees. The court based its conclusion on the fact that the revenues involved derived from assessments against member banks levied under a statute, 12 U.S.C. § 244 (2000), which specifically declared that "such assessments shall not be construed to be Government funds or appropriated moneys." It was this express statutory disavowal of public ownership of the funds collected through the assessments, together with what the Federal Circuit referred to as "the absence of the conventional language authorizing funds to be appropriated," 782 F.2d at 1005, that led the *Denkler* court to conclude that Congress had manifested a clear intention to separate the Board of Governors of the Federal Reserve System from general federal revenues.

Similarly, in *Aaron*, the threshold question was whether a government corporation, the Federal Prison Industries, Inc. (UNICOR), was a non-appropriated activity. In deciding that question in the affirmative, the court drew on numerous references in the relevant legislative history to demonstrate that Congress intended UNICOR's Prison Industries Fund, comprised of revenues derived from the sale of prisoner-made products, to constitute non-public funds. But the best indication of Congress' intention, the court went on to say, "is the corporation's own statutory provision[ ] ... which directs the Prison Industries Fund—not the Treasury in general—to receive all UNICOR monies." *Aaron*, 51 Fed.Cl. at 693.

Neither of these cases undermines our conclusion that the Mint's Public Enterprise Fund is an appropriated fund. We have here neither the express statutory declaration of non-appropriated funds that was vital to the decision in *Denkler*, nor the statutory directive calling for the segregation of agency funds from general federal revenues that was of chief importance to the analysis in *Aaron*. Indeed, as to this latter point, our case is quite the contrary: Section 5136 specifically requires "any amount in the Fund that is determined to be in excess of the amount required by the Fund [to] be transferred to the Treasury for deposit as miscellaneous receipts." And, as did the court in *Aaron*, we too see this depository designation as reflective of Congress' understanding of the character of the funds at issue. But, unlike *Aaron*, in this case that designation affirms that the Mint's receipts are funds belonging to the United States to be deposited, as 31 U.S.C. § 3302(b) requires, into the general

fund of the Treasury as miscellaneous receipts.

The foregoing views formalize the bench ruling issued on June 10, 2002, denying defendant's motion to dismiss the complaint for lack of jurisdiction.

## III.

■ Turning then to the merits of the case, we must also reject plaintiff's contention that the Mint's use of Kermit the Frog as the spokesperson for the Quarters Program reflects the unlicensed use of the marketing concepts put forward in plaintiff's own proposal. This determination is based on the following findings:

1. The business relationship between the United States Mint and the Jim Henson Company, the creator of Kermit the Frog, was not prompted by actions of the Mint but rather was the result of a contact initiated by the Henson Company: a letter of January 8, 1999, from Jane Leventhal, the individual in charge of the Henson Company's publishing division, to Philip N. Diehl, then the Director of the Mint, proposing the creation and publication of a book "where kids could collect all 50 quarters."

2. Although Ms. Leventhal's letter does not specifically tie in the use of Kermit the Frog to the proposed publishing venture, that character is mentioned in the letter:

I have already approached Simon and Schuster's juvenile publisher about the project and she was very enthusiastic. We discussed whether Kermit or another Muppet should appear in the book, but I suggested that we create the book without any previously licensed characters. However, we have not ruled out the idea of creating a new Muppet-like character to act as the book's host.

3. Upon receipt of her letter, Mr. Diehl contacted Ms. Leventhal to arrange a meeting with the Henson Company. While the immediate purpose of this meeting was to explore the marketing potential of Ms. Leventhal's proposal, Mr. Diehl had a larger objective in mind: to lay the groundwork for the possible use of Kermit the Frog in the Mint's marketing plans. As Mr. Diehl testified at trial, the idea of utilizing Kermit the Frog in conjunction with the marketing of the Quarters Program came to him almost immediately upon the receipt of Ms. Leventhal's letter. The letter "galvanized my action" is the way the witness put it.

4. At the time Mr. Diehl received Ms. Leventhal's letter, he was not aware that plaintiff had proposed the use of a television personality—a fictional character known as Doug Funnie—to serve as a spokesperson to promote the Quarters Program. In explaining his own attraction to the use of Kermit the Frog as a promotional tool, Mr. Diehl testified that the Mint's marketing needs were not "just a matter of appealing to kids, [but] also a matter of appealing to their Baby Boomer parents and grandparents." And with Kermit the Frog, the witness went on to note, "there is a cross-generational appeal in awareness that . . . no other character represents, that I'm aware of." The witness described Kermit as "a personality who had virtually ubiquitous name identification."

5. In addition to Mr. Diehl, a second former official of the Mint who played a formative role in the engagement of Kermit the Frog as the promotional star of the Quarters Program was Gregory Carson, the Director of New Business Development.

In this witness' recollection of events, the idea of using Kermit the Frog as the Mint's spokesperson for the Quarters Program did not originate with Mr. Diehl but rather was the product of a collaborative effort between Mr. Carson and Ms. Leventhal. However, this difference in recollection between Mr. Carson and Mr. Diehl as to the source of the idea leading to Kermit the Frog's role in the Quarters Program is not a relevant evidentiary concern. What matters here is that the witness shared Mr. Diehl's enthusiasm for the engagement of Kermit the Frog as a spokesperson for the Mint—"the attraction to me was that Kermit the Frog . . . is one of the most recognizable characters in the world"—and, like Mr. Diehl, this witness too had no knowledge of the contents of plaintiff's proposal.

6. The third, and last, of the Mint officials to have played a contributing role in the marketing plan that made Kermit the Frog

 

the spokesperson for the Quarters Program was David Pickens, the Associate Director for Sales and Marketing.

Unlike Mr. Diehl and Mr. Carson, Mr. Pickens was familiar with plaintiff's proposal. However, the proposal was not one that Mr. Pickens favored; he thought the proposal "too juvenile" in the sense "of whether or not it could carry the full breadth and measure of the [marketing] campaign, as important as it was ... to us and the Mint and to the nation at large."

These same reservations also initially led Mr. Pickens to resist the idea of using Kermit the Frog as the Mint's spokesperson. As the Associate Director for Sales and Marketing, Mr. Pickens favored pursuing his own marketing concepts to promote the Quarters Program, including, for example, the use of well-known National Football League quarterbacks to serve as spokespersons.

7. Notwithstanding his initial resistance to adopting Kermit the Frog as the marketing icon for the Quarters Program, Mr. Pickens testified that he was gradually won over to the merits of that strategy as his own awareness of Kermit's marketing and promotional capabilities increased. In explaining this transition in his thinking, Mr. Pickens testified:

> I learned more and more about him as I began to understand his effect on people and his effect on how he operates, both as a child-like character and also as a mature adult. There's a certain paradoxical quality about Kermit. And young people identify with him and adults and older people identify with him.

8. While the testimony of Mr. Pickens leaves no doubt that he eventually came to appreciate the marketing potential inherent in the use of Kermit the Frog as the spokesperson for the Quarters Program, the record also supports the conclusion that it was Mr. Diehl's and Mr. Carson's active promotion of that particular marketing strategy that influenced and ultimately redirected Mr. Pickens' views on how best to sell the Quarters Program to the public.

On the basis of the foregoing factual determinations, the court concludes that there is no evidence in the record, direct or circumstantial, that would support the conclusion that, in adopting Kermit the Frog as the spokesperson for the Quarters Program, the United States Mint knowingly and intentionally adopted the marketing concepts set out in plaintiff's proposal. Plaintiff's marketing proposal was an "unknown" to those officials of the Mint, Philip Diehl and Gregory Carson, who were the chief driving forces in introducing the Henson Company's creation, Kermit the Frog, into the promotional campaign for the Quarters Program. As to the other participant in that process, David Pickens, he too cannot be found to have impermissibly adopted plaintiff's ideas. Mr. Pickens owes his "inspiration" to the "Kermit the Frog culture" that Mr. Diehl enthusiastically promoted and not to the contents of plaintiff's proposal. In short, there was no breach of an implied contract of fair dealing.

### Conclusion

For the reasons stated in this opinion, defendant's motion to dismiss the complaint for lack of jurisdiction is denied and plaintiff's claim of breach of contract is rejected. The Clerk is directed to dismiss plaintiff's complaint.