**AINS, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5134.

United States Court of Appeals, Federal Circuit.

April 23, 2004.

Craig A. Holman, Holland & Knight, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Kara L. Daniels.

Patricia M. McCarthy, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Kyle E. Chadwick, Attorney. Of counsel on the brief was James L. Adler, Office of Chief Counsel, United States Mint, of Washington, DC.

Before BRYSON, GAJARSA, and PROST Circuit Judges.

GAJARSA, Circuit Judge.

AINS, Inc. ("AINS") appeals the United States Court of Federal Claims' May 23, 2003 dismissal for lack of subject matter jurisdiction of AINS's claim that the United States Mint ("Mint") had breached its contract with AINS. *AINS, Inc. v. United States*, 56 Fed. Cl. 522 (2003). We find that the Court of Federal Claims correctly determined that the Mint is a "non-appropriated funds instrumentality" ("NAFI"). Because Congress has not waived sovereign immunity to allow breach of contract suits against NAFIs other than in a few statutorily enumerated exceptions, and because the Mint is not among those exceptions, we affirm.

## BACKGROUND

The Mint awarded AINS a contract to provide various information technology and computing support services to the Mint on or about April 10, 1997. This contract outlined not only AINS's obligations to the Mint, but also the Mint's obligations to AINS. On April 17, 2002, AINS brought the present suit alleging that the Mint had breached several of those contractual obligations. AINS asserted that jurisdiction was proper under the Tucker Act, which waives sovereign immunity to allow private parties to sue the United States for breach of contract. 28 U.S.C. § 1491(a)(1) (2000) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States ..."). The govern-

ment moved to dismiss AINS's complaint for lack of subject matter jurisdiction, arguing that the United States has not waived its sovereign immunity to allow such suits against the Mint.

The factual allegations surrounding AINS's claim are not pertinent to this appeal because the Court of Federal Claims granted the government's motion and dismissed AINS's claim for lack of subject matter jurisdiction. The basis of the government's assertion of sovereign immunity, which the Court of Federal Claims accepted, is the NAFI doctrine, an established exception to the Tucker Act. The NAFI doctrine is based on the premise that the government has never waived its sovereign immunity to allow private parties to bring breach of contract claims against NAFIs. As a result, the Tucker Act does not provide the Court of Federal Claims with subject matter jurisdiction to hear suits against NAFIs.

The government asserts that the Mint became a NAFI in 1995, when Congress enacted 31 U.S.C. § 5136, creating the Mint's "Public Enterprise Fund." The government asserts that under this statute, the Mint must fund all of its operations with revenues derived solely from its own activities, *not* by drawing upon appropriated funds—a defining feature of a NAFI. The government further contends that Section 5136 demonstrates a firm indication by Congress that it intended to absolve the United States (i.e., the general fund) from liability for the Mint's actions—a second defining feature of a NAFI.

In response, AINS contends that the Mint is not a NAFI, relying in part on *MDB Communications, Inc. v. United States*, 53 Fed. Cl. 245 (2002), where, in fact, the Court of Federal Claims held that the United States Mint *is not* a NAFI.

According to AINS, the Mint is not a NAFI because: (1) the Mint operates on a "continuous appropriation;" (2) Congress never expressed a firm intent to separate the Mint's activities from the general fund; and (3) Congress never sought to absolve the U.S. from liability for acts of the Mint. These points are among the considerations relevant to determining which government instrumentalities are NAFIs.

■ The Court of Federal Claims in the present case disagreed with the previous holding in *MDB*.[1] The Court of Federal Claims presented a well researched and well drafted review of the history of the NAFI doctrine, and assembled a coherent interpretation of the doctrine's sometimes confusing development in case law. The Court of Federal Claims then applied its analysis to rule that the Mint *is* a NAFI, and consequently to dismiss AINS's complaint for lack of subject matter jurisdiction. AINS timely appealed. We have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### A. Standard of Review

■ Whether the Court of Federal Claims properly dismissed AINS's complaint for lack of jurisdiction is a question of law that we review de novo. *Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331, 1334 (Fed.Cir.2003). Absent some specific statutory provision to the contrary, the Court of Federal Claims lacks jurisdiction over actions in which appropriated funds cannot be obligated. *Id.*; *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed.Cir.2001); *L'Enfant Plaza Props., Inc. v. United States*, 229 Ct.Cl. 278, 668 F.2d 1211, 1212 (1982). We

---

**1.** CFC holdings, like those of federal district courts, are instructive but not precedential, and do not bind future court rulings.

therefore review de novo the Court of Federal Claims' ruling that the Mint is a NAFI.

## B. Development of the NAFI Doctrine

■ The Court of Federal Claims presented an excellent discourse on the historical development of both NAFIs and the NAFI doctrine, which we draw upon liberally in our own review of the relevant history. The sine qua non of all NAFIs is apparent in their name: they do not receive appropriated funds. As a result, all NAFIs are government "instrumentalities" that are at least essentially self-supporting. Both the formal legal definition of NAFIs and the implications of the Tucker Act's inapplicability to government agencies that meet that definition, however, are somewhat more complicated.

The first historically recorded NAFI in the United States was a self-supporting post fund that Army officers administered to aid indigent widows and children of deceased Civil War soldiers. Congress expanded upon this idea to develop a system of "post exchanges" (PXs), which the Army regulates and operates as profit making ventures. After World War II, Congress expanded the idea of self-supporting agencies even further, and NAFIs began to appear throughout the civilian sector.

The NAFI *doctrine*, as it relates to the Court of Federal Claims and to jurisdiction under the Tucker Act, began to develop following *Standard Oil Company of California v. Johnson*, 316 U.S. 481, 484–85, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). In *Standard Oil*, the Supreme Court ruled that PXs qualified for a federal government exemption from a California motor vehicle fuel tax. *Id.* According to the Court, "post exchanges as now operated are arms of the Government deemed by it essential for the performance of governmental functions," though the "government

assumes none of the financial obligations of the exchange." *Id.* at 485, 62 S.Ct. 1168.

■ In other words, *Standard Oil* recognized the existence of "government agencies" for which the government had not accepted financial responsibility. *Standard Oil* did not address the questions of liability and/or of sovereign immunity as applied to such "agencies." Shortly thereafter, however, the Court of Claims opined that its jurisdiction under the Tucker Act was limited to claims against the general fund, or more specifically, to claims against government instrumentalities whose judgments could be paid from appropriated funds. The Court of Claims reasoned that when the government assumed no liability for a federal entity, the government could not be said to have consented to suit against that entity—and that the Tucker Act consequently provided the Claims Court with no jurisdiction to hear complaints against these entities. NAFIs therefore retain their sovereign immunity from suit for breaches of contract that Congress waived with respect to government agencies funded by appropriations from the general fund. *See, e.g., Borden v. United States*, 126 Ct.Cl. 902, 116 F.Supp. 873 (1953); *Pulaski Cab Co. v. United States*, 141 Ct.Cl. 160, 157 F.Supp. 955 (1958); *Kyer v. United States*, 177 Ct.Cl. 747, 369 F.2d 714 (1966).

It appears that *Standard Oil* did not compel this result. The early cases articulating the doctrine that NAFIs retained sovereign immunity met with spirited insistence that the doctrine emerged from an erroneous interpretation of *Standard Oil. See, e.g., Borden*, 116 F.Supp. at 878–80 (Whitaker, J., dissenting); *Pulaski Cab Co.*, 157 F.Supp. at 958 (Whitaker, J., concurring). In the Court of Claims' first significant NAFI doctrine case, Borden was an accountant employed by an Army PX under contract with the PX. *Borden,*

116 F.Supp. at 873. Someone stole payroll funds from Borden's office, and some of these funds were never recovered. The PX withheld an amount equal to its loss from Borden's salary, alleging that his negligence had caused the loss. Borden sued the United States to recover his withheld salary. The court recognized that this case presented an anomaly because Borden seemed to have no avenue along which to seek redress of his claims. *Id.* at 876. He could not sue the PX, with whom he had a contract, because it was an arm of the government. And "in the light of [*Standard Oil* ] . . . [the court] reluctantly reach[ed] the conclusion that plaintiff c[ould] not sue the United States on a contract of employment which is signed by the Army Exchange Service, European Theater." *Id.* at 877. In dissent, Judge Whitaker complained that

> [t]he majority recognize that [Borden] should have a right of action, but they feel compelled to hold that he has not by the decision of the Supreme Court in *Standard Oil* . . . . I do not feel so compelled. . . . Army regulations say exchange contracts are not government contracts, and, yet, the Supreme Court says that exchanges are "arms of the government." . . . By what authority does the Army say that their contracts are not government contracts? . . . The Army cannot set aside an Act of Congress.

*Id.* at 878–79 (Whitaker, J., dissenting).

Five years later, the Pulaski Cab Company sued the government over alleged breaches of its contract with a PX to provide taxi service within the confines of the post. *Pulaski Cab,* 157 F.Supp. at 955. The plaintiffs claimed that jurisdiction was proper under the Tucker Act. The court, however, found Pulaski Cab's claim indistinguishable from Borden's. *Id.* This time Judge Whitaker concurred, but only because the contract at issue included a "specific declaration of governmental nonliability." *Id.* at 959.

Though Judge Whitaker's view did not prevail and the NAFI doctrine became accepted law, he and his colleagues did share a belief that were Congress truly aware of the ramifications of the doctrine, action consistent with the policy rationale underlying the Tucker doctrine would follow. This theme arose virtually every time that the court encountered a NAFI. *See, e.g., Borden,* 116 F.Supp. at 878, 878–80; *Pulaski Cab Co.,* 157 F.Supp. at 958 (Whitaker, J., concurring). In 1966, for example, the Court of Claims ruled that the Grape Crush Administrative Committee [2] was a NAFI and therefore dismissed the plaintiff's breach of contract claim against it. *Kyer,* 369 F.2d at 719. The court sympathized that "though perhaps of little comfort, . . . the lack of jurisdiction which plaintiff has faced at every turn is a matter which sorely needs congressional correction." *Id.*

Congress responded to this sore need in 1970, by extending Tucker Act jurisdiction to include PXs: "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aero-

---

2. The Grape Crush Administrative Committee was an agency, established under the authority of The Agricultural Marketing Agreement Act of 1937, operating under the control of the Secretary of Agriculture. Its general purpose was to establish and maintain orderly conditions for the grape market to avoid "unreasonable" fluctuations in supplies or prices "in the interest of producers and consumers." *Kyer,* 369 F.2d at 717. The Grape Crush Administrative Committee was terminated by statute in 1964. *Id.* at 719 n. 18. *See also, Lion Raisins, Inc. v. United States,* 58 Fed. Cl. 391, 395 n. 2 (2003) (holding that the still-extant Raisin Administrative Committee is a NAFI).

nautics and Space Administration shall be considered an express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Congress did not, however, alter the general rule excluding NAFIs from Tucker Act jurisdiction, nor did Congress waive the protective basis of sovereign immunity to allow suit other than against the few enumerated exceptions. *See McDonald's Corp. v. United States,* 926 F.2d 1126, 1129–33 (Fed.Cir.1991).

The Supreme Court addressed the NAFI doctrine for the first time in *United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). The plaintiff[3] claimed that the Army and Air Force Exchange Service (AAFES) had breached its employment contract with him. The government moved to dismiss for lack of jurisdiction. The government claimed that though Congress had amended the Tucker Act to include jurisdiction over "express or implied contracts" with the AAFES, 28 U.S.C. § 1491(a)(1), the waiver of sovereign immunity was nevertheless inapplicable to employment contracts—and in the alternative, that AAFES employees do not have a contractual relationship with their employer, but rather serve by "appointment." *Hopkins,* 427 U.S. at 126–27, 96 S.Ct. 2508. The Supreme Court ruled that Tucker Act jurisdiction was appropriate for claims brought by contract employees, but not by appointed employees.[4] *Id.* at 130, 96 S.Ct. 2508.

In reviewing the history of suits against PXs, the Supreme Court noted that "[t]he status of claims against military post ex-

changes has been in some doubt since the decision of this Court in *Standard Oil* " and a subsequent "series of decisions by the Court of Claims to the effect that it lacked jurisdiction over claims concerning the activities of non-appropriated fund instrumentalities." *Id.* at 124–25, 96 S.Ct. 2508. The Court, in turn, defined a "nonappropriated fund instrumentality" as a federal entity "which does not receive its monies by congressional appropriation." *Id.* at 125 n. 2, 96 S.Ct. 2508. The Court also described the 1970 amendment as expressing a clear Congressional intent "to afford contractors a federal forum in which to sue nonappropriated fund instrumentalities by doing away with the inequitable 'loophole' in the Tucker Act." *Id.* at 126, 96 S.Ct. 2508 (citing S.Rep. No. 91–268, p. 2 (1969); H.R.Rep. No. 91–933, p. 2 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3477, 3478). Finally, in addition to accepting the NAFI doctrine as a proper reading of the Tucker Act, the Supreme Court also echoed the Court of Claims' concerns that the denial of jurisdiction under the NAFI doctrine could (and often would) leave claimants without a forum in which to seek a remedy, but that "it is up to Congress to remedy this apparent harsh result." *Id.* at 125, 96 S.Ct. 2508. Congress has not acted since *Hopkins.*

## C. Applying the NAFI Doctrine

Following *Hopkins,* first our predecessor court, the Court of Claims, and then this court began to develop operational tests to help trial courts determine which

---

3. The original plaintiff died before the case reached the Supreme Court. His widow pursued the case as named plaintiff. *Hopkins,* 427 U.S. at 124 n. 1, 96 S.Ct. 2508.

4. This ruling is yet one more anomalous implication of the NAFI doctrine that various members of the Court of Claims continued to question. Judge Nichols, for example, complained that under *Hopkins,* "a contract em-

ployee of an unappropriated fund agency can sue for back pay, if deprived of it by legal wrong, but one appointed and enrolled in the ordinary non-contractual way cannot. There is no reason for this distinction. It is simply a matter of defective statutory draftsmanship." *Atkins v. United States,* 214 Ct.Cl. 186, 556 F.2d 1028, 1072 (1977). He opined, however, "[s]omeday, probably, it will be corrected." *Id.*

government agencies were, in fact, NAFIs. In *L'Enfant Plaza,* the Court of Claims ruled that simple financial self-sufficiency was not enough to make the Office of the Comptroller of the Currency a NAFI, because "[t]here must be a clear expression by Congress that the agency was to be separated from general federal revenues." *L'Enfant Plaza,* 668 F.2d at 1212.

In *Denkler v. United States,* 782 F.2d 1003 (Fed.Cir.1986), we concluded that the Board of Governors of the Federal Reserve System ("Fed") was a NAFI because its enabling statute, 12 U.S.C. §§ 243–44: (1) Requires the Fed to finance its own activities by taxing the Federal Reserve Banks, rather than by requesting appropriated funds; (2) Explicitly states that the funds that the Fed receives from the Banks are not construed to be government funds or appropriated moneys; and (3) Unlike most enabling statutes, does not authorize appropriations. *Denkler,* 782 F.2d at 1004–05.

In *Furash,* we affirmed the Court of Federal Claims' finding that the Federal Housing Finance Board ("Finance Board"), an entity that administers the federal home loan bank system, was a NAFI. *Furash,* 252 F.3d at 1339. We explained that for an agency to qualify as a NAFI, "there must be a firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts of the agency." *Id.* We found that Congress had made such an intention clear with respect to the Finance Board, and therefore ruled it a NAFI.

Most recently, we considered the government's claim of NAFI status for Federal Prison Industries ("FPI," also known by its trade name, "UNICOR"), a government-owned corporation that was created in 1934 to provide work simulation programs and training opportunities for inmates of federal correctional facilities. We concluded that FPI was a NAFI because FPI does not operate with appropriated funds, and that furthermore, "FPI's enabling legislation includes no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part." *Core Concepts,* 327 F.3d at 1335–37.

■ The courts, however, have not been alone in grappling with the precise contours of the NAFI definition; the General Accounting Office (GAO) has also had occasion to consider NAFIs.[5] According to the GAO, all "revolving" funds (i.e., a single account to which an agency deposits its receipts and from which that agency draws its expenditures) are "permanent or continuing appropriations." Under this definition, agencies that maintain revolving funds would not qualify as NAFIs. *See Core Concepts,* 327 F.3d at 1338.

The GAO's definition is clearly inconsistent with our precedent. Were we to apply the GAO's definition to either the Fed or the Finance Board, neither one could be

---

5. "The General Accounting Office is the audit, evaluation, and investigative arm of Congress.... GAO examines the use of public funds, evaluates federal programs and activities, and provides analyses, options, recommendations, and other assistance to help the Congress make effective oversight, policy, and funding decisions ...." *http://www.gao.gov.* In this role, the GAO must make certain determinations about the character of individual government programs and/or agencies, including deciding which operate on nonappropriated funds. The GAO's determinations do not control the court's analysis of Tucker Act jurisdiction. For example, the GAOs determination that the Fed was not a NAFI led the government to assert that the Dual Compensation Act, 5 U.S.C. 5531, applied to Fed employees. *See Denkler,* 782 F.2d at 1004. We ruled to the contrary; Fed employees do not fall under the Dual Compensation Act because the Fed is a NAFI.

ruled a NAFI—directly contradicting our holdings in *Denkler*, 782 F.2d at 1005, and in *Furash*, 252 F.3d at 1339, respectively. We explicitly declined to adopt the GAO's approach to determining which agencies are NAFIs in *Core Concepts*, 327 F.3d at 1334. Instead, we applied the proper framework of *Furash*. *See Core Concepts*, 327 F.3d at 1331.

 The GAO's approach remains misplaced in an assessment of Tucker Act jurisdiction. Revolving funds are not necessarily "continuing appropriations," and they will not disqualify an agency from being classified as a NAFI. AINS urges us to reconsider this decision, particularly in light of the growing popularity of revolving funds and the unfairness of contracts rendered unenforceable by sovereign immunity. Even if we chose to do so, however, we cannot. "[P]rior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc." *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988).

### D. The Mint's Claim to NAFI Status at the Court of Federal Claims

The present matter marks the second time in the past few years that the Mint has asserted its NAFI status as a shield from suit in the Court of Federal Claims, though it is the first time that the question has reached this court. Different judges of the Court of Federal Claims reached different conclusions. In *MDB*, 53 Fed. Cl. 245, an unsuccessful bidder sued the Mint. The government claimed sovereign immunity, arguing that the Mint is a NAFI. In *MDB*, as in this case, the government relied primarily on Section 5136's requirement that profits from seigniorage be deposited in the "Public Enterprise Fund" to finance the Mint's operation:

There Shall be established in the treasury of the United States, a United States Mint Public Enterprise Fund (the "Fund") for fiscal year 1996 and hereafter: *Provided*, That all receipts from the Mint operations and programs including the production and sale of numismatic items, the production and sale of circulating coinage, the protection of government assets, and gifts and bequests of property, real or personal shall be deposited into the Fund and shall be available without fiscal limitations: *Provided further*, That all expenses incurred by the Secretary of the Treasury for the operations and programs of the United States Mint that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs, and any expense incurred pursuant to any obligation or other commitment of Mint operations and programs that was entered into before the establishment of the Fund, shall be paid out of the Fund: *Provided further*, . . . That the fund may retain receipts from the Federal Reserve System from the sale of circulating coins at face value for deposit into the Fund (retention of receipts is for the circulating operations and programs): . . . *Provided further*, That at such times as the Secretary of the Treasury determines appropriate, but not less than annually, any amount in the Fund that is determined to be in excess of the amount required by the Fund shall be transferred to the Treasury for deposit as miscellaneous receipts. . . .

31 U.S.C. § 5136 (2000).

The government argued that the language of the statute clearly demonstrated that Congress intended the Mint to be a self-funding agency, free and clear of any appropriations. As further support for this argument, the government cited a Senate Committee report:

The Treasury Department Appropriation Act for Fiscal Year 1996 consolidated the numismatic and circulating coin operations of the United States Mint into one revolving fund, the United States Mint Public Enterprise Fund. This made the Mint's sole source of funding its revenue-generating programs rather than an annual appropriation.

S.Rep. No. 106–356, at 2 n. 1 (2000). *See MDB,* 53 Fed. Cl. at 248. The *MDB* court applied the GAO's rationale to reject the government's arguments. The court noted first that money that the Mint collects helps to fund the government, and second that as a revolving fund, the Public Enterprise Fund is a "continuing appropriation," per the GAO. *Id.* at 248–49. The *MDB* court ruled that the Mint is not a NAFI, but nevertheless dismissed the case for failure to state a claim. *Id.* No appeal followed.

The *MDB* court's reliance on the GAO's rationale led it to conduct the wrong analysis and to reach the wrong conclusion. The proper analysis is the one that we discussed in *Furash* and in *Core Concepts.* This analytic framework rests upon the statutes defining an "appropriation" as congressionally delegated statutory "authority [to] mak[e] amounts available for obligation or expenditure," 31 U.S.C. § 701(2)(C), and requiring that an appropriation be explicit, not implicit in statutory language. 31 U.S.C. § 1301(d). Authorizing statutes creating revolving funds, such as the Mint's public enterprise funds, do not meet this statutory definition of an appropriation. When an agency, like the Mint, has its funds segregated by statute from the general fund into a dedicated revolving fund, without any statutory authorization to add appropriated funds to the revolving fund, "appropriated funds not only are not used to fund [that agency], but could not be." *United States v.*

*Gen. Elec. Corp.,* 727 F.2d 1567, 1570 (Fed. Cir.1984).

The Court of Federal Claims in the present case correctly applied the proper analysis to conclude that the Mint is a NAFI and to dismiss AINS's complaint for lack of subject matter jurisdiction.

### E. The Four–Factor NAFI Test

The NAFI doctrine has evolved slowly since the Supreme Court first recognized the existence of NAFIs. *Standard Oil,* 316 U.S. at 481, 62 S.Ct. 1168. The Court of Federal Claims in the present case drew together the present state of the NAFI doctrine in a manner that allows us to distill from case law an analytic four-factor test:

█ A government instrumentality is a NAFI if: (1) It does "not receive its monies by congressional appropriation." *Hopkins,* 427 U.S. at 125 n. 2, 96 S.Ct. 2508; (2) It derives its funding "primarily from [its] own activities, services, and product sales." *Cosme Nieves v. Deshler,* 786 F.2d 445, 446 (1st Cir.1986); (3) Absent a statutory amendment, there is no situation in which appropriated funds could be used to fund the federal entity. *General Electric,* 727 F.2d at 1570; and (4) There is "a clear expression by Congress that the agency was to be separated from general federal revenues." *L'Enfant Plaza,* 668 F.2d at 1212.

█ Every government agency that we have considered that met all four factors is a NAFI, *see, e.g., Denkler,* 782 F.2d at 1004–05; *Furash,* 252 F.3d at 1339; *Core Concepts,* 327 F.3d at 1335–37, and we have not found a NAFI absent any one of these factors. Furthermore, because "[j]urisdiction under the Tucker Act must be exercised absent a firm indication by Congress that it intended to absolve the appropriated funds of the United States

from liability for acts of the [agency in question]," *L'Enfant Plaza,* 668 F.2d at 1212, and because as a practical matter, the first three factors are necessary for an agency to be self-supporting and independent of the general fund, every NAFI must meet all four factors.

The fourth factor is often the least obvious; congressional intent is not always explicit in statutory language. In the past, we have found several different statutory ways for Congress to express its intent to separate an agency from the general fund. *See, e.g., L'Enfant Plaza,* 668 F.2d at 1212 (explicit prohibition from receiving appropriated funds); *Denkler,* 782 F.2d at 1004–05 (absence of language authorizing appropriations); *id.* at 1005 (explicit statement that agency's funds shall not be construed to be government funds or appropriated moneys); *Core Concepts,* 327 F.3d at 1336 (direction that all monies under the agency's control be deposited into the U.S. Treasury to the credit of that agency).

Plaintiffs invariably argue that the particular agency that they are suing, despite meeting all four factors, is nevertheless not a NAFI. To date, none of their arguments has prevailed. In *Furash,* the plaintiffs asserted that an agency required to either deposit the funds that it generates into the general fund, or to draw funds from the general fund, cannot be a NAFI. *Furash,* 252 F.3d at 1341. We rejected this argument, noting that as long as an agency uses nonappropriated funds solely to pay its own expenses, it remains a NAFI. *Id.*

The plaintiffs in *Furash* also argued that if the enabling statute contains a narrow, specific exception to the nonappropriated fund statutory scheme whereby the agency may receive limited appropriated funds for the specified narrow purpose, that agency is not a NAFI. *Id.* We similarly rejected that argument, primarily because of the narrowness of the exception. *Id.*

The plaintiffs in *Kyer* argued that an agency cannot be a NAFI if, under the general statutory scheme of governmental organization, the cabinet Secretary nominally overseeing that agency has the discretion to reorganize an entire Department, and in doing so to attach new responsibilities and their accompanying appropriated funds to the purported NAFI. *Kyer,* 369 F.2d at 717. Our predecessor court rejected this argument, noting that even such a discretionary reorganization would not permit the Secretary to use appropriated funds for NAFI purposes. *Id.*

### F. Applying the Test to the Mint

█ We must now apply the four-factor test to the Mint, and in particular to its enabling statute, 31 U.S.C. § 5136: (1) The Mint *does not* receive its monies by congressional appropriation. 31 U.S.C. § 5136 ("all expenses incurred ... for the operations and programs of the United States Mint ... shall be paid out of the Fund"). (2) The Mint derives its funding primarily through its own activities. *Id.* ("all receipts from the Mint operations and programs ... shall be deposited into the Fund and shall be available without fiscal limitations."). (3) There does not appear to be any mechanism whereby the Mint could receive appropriated funds without a statutory amendment. *Id.* (4) The Mint's expenses are paid from its own revolving fund, funded through its own activities. *Id.* The statute makes no provisions for appropriations, *id.,* and the legislative history indicates Congressional intent to keep the Mint self-financing and distinct from the general fund. *See MDB,* 53 Fed. Cl. at 248 (citing S.Rep. No. 106–356, at 2 n. 1 (2000)); *AINS,* 56 Fed. Cl. at 541 (citing H.R.Rep. No. 104–183, app. 6, at 23 (1995)).

The Mint's enabling statute is explicit about the first two of the factors. Under 31 U.S.C. § 5136, the Mint very clearly does "not receive its monies by congressional appropriation." *Hopkins,* 427 U.S. at 125 n. 2, 96 S.Ct. 2508. Instead, it derives its funding "primarily from [its] own activities, services, and product sales." *Cosme Nieves,* 786 F.2d at 446.

The third and fourth factors are less explicit in the statute. The third factor can be particularly challenging, because it is always difficult to prove a negative— here, the unavailability of appropriated funds absent a statutory amendment. Section 5136, however, like the Fed's authorizing statute, includes "no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part." *Denkler,* 782 F.2d at 1005.

As to the fourth factor, Section 5136 requires the Mint to operate solely on the funds that it generates itself and maintains in the Public Enterprise Fund. The statutory direction of all receipts from the Federal Reserve System and from the sale of circulating coins at face value into the Public Enterprise Fund demonstrates a clear congressional intent to segregate the Mint's funds from the general fund. *See Furash,* 252 F.3d at 1339–40. As the Court of Federal Claims correctly noted, though the legislative history supports this conclusion, "[t]he statute here is clear on its face." *AINS,* 56 Fed. Cl. at 542. Congress intended the Mint to be self-financing and "separated from general federal revenues." *L'Enfant Plaza,* 668 F.2d at 1212.

Because the Mint meets all four factors, it is a NAFI. AINS's attempts to negate the Mint's NAFI status by noting first, that the Secretary of the Treasury may transfer the surplus in the Mint's revolving fund to the general fund, and second, that in a hypothetical reorganization, the Secretary could, at his or her sole discretion, shift new functions and their accompanying appropriated funds into the Mint, must fail. These are precisely the arguments rejected in *Furash,* 252 F.3d at 1341, and in *Kyer,* 369 F.2d at 717, respectively. In short, the Court of Federal Claims correctly dismissed AINS's claim against the Mint for lack of subject matter jurisdiction.

In reaching its legally correct conclusion, the Court of Federal Claims lamented that "the extension of the NAFI doctrine [may] ultimately increase the price of government goods and services by denying the efficiency of the market place to institutions, such as private enterprise funds, ironically established to mimic the market place." *AINS,* 56 Fed. Cl. at 543. The Court of Federal Claims also reminded us of Abraham Lincoln's observation in his 1861 message to Congress: " 'It is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals.' " *Id.* at 544.

This reminder is likely to provide AINS with little solace. The government prevails because no judicial relief is available to contractors who choose to contract with NAFIs. Unless Congress waives a NAFI's sovereign immunity, the courts can entertain only the government's allegations of breach, not those brought by the contractor. Absent Congressional authorization, the Court of Federal Claims has no jurisdiction to hear claims against NAFIs.

## CONCLUSION

Because the Court of Federal Claims correctly determined that the Mint is a NAFI and that Congress has not waived the Mint's sovereign immunity from suit,

dismissal for lack of subject matter jurisdiction was appropriate.

*AFFIRMED.*

COSTS

No Costs.